# IN THE SUPREME COURT OF TENNESSEE
## AT NASHVILLE
### February 7, 2018 Session

## INDIVIDUAL HEALTHCARE SPECIALISTS, INC.
### v.
## BLUECROSS BLUESHIELD OF TENNESSEE, INC.

**Appeal by Permission from the Court of Appeals**
**Chancery Court for Davidson County**
**No. 11-1042-III      Ellen H. Lyle, Chancellor**

_____

### No.  M2015-02524-SC-R11-CV

_____

We granted permission to appeal in this breach-of-contract case to address the use of extrinsic evidence in the interpretation of contracts.  Tennessee judges have long used extrinsic evidence of the context and circumstances at the time the parties entered into the contract to facilitate interpretation of contractual terms in accord with the parties' intent.  However, the written words are the lodestar of contract interpretation, and Tennessee courts have rejected firmly any notion that courts may disregard the written text and make a new contract for parties under the guise of interpretation.  Tennessee has consistently enforced the parol evidence rule to prohibit the use of evidence of pre-contract negotiations in order to vary, contradict, or supplement the contractual terms of a fully integrated agreement.  Thus, in interpreting a fully integrated contract, extrinsic evidence may be used to put the written terms of the contract into context, but it may not be used to vary, contradict, or supplement the contractual terms in violation of the parol evidence rule.  As applied to this case, we hold that the defendant insurance company did not breach the parties' agreement by modifying renewal commission rates on existing policies, but it did breach the agreement by refusing to pay commissions to the plaintiff agency after their agreement was terminated.  In addition, because the indemnity provision in the parties' agreement does not specifically authorize fee shifting in a suit between the two contracting parties, we hold that the plaintiff agency is not entitled to an award of attorney fees.  We further conclude that the alleged systemic commission underpayments in this case were not inherently undiscoverable under any definition of that term.  Consequently, even if we were to conclude that the discovery rule applies when the contractual breach is "inherently undiscoverable," the plaintiff agency's claim

for any underpayments would not qualify under the facts of this case.  The case is remanded for further proceedings consistent with this opinion.

**Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Chancery Court Affirmed in Part, Reversed in Part, and Remanded**

HOLLY KIRBY, J., delivered the opinion of the Court, in which JEFFREY S. BIVINS, C.J., and CORNELIA A. CLARK, SHARON G. LEE, and ROGER A. PAGE, JJ., joined.

E. Todd Presnell, Joel D. Eckert, Edmund S. Sauer, Junaid A. Odubeko, and Jessica Jernigan-Johnson, Nashville, Tennessee, for the defendant/appellant/cross-appellee, BlueCross BlueShield of Tennessee, Inc.

Jay S. Bowen and Will Parsons, Nashville, Tennessee, for the plaintiff/appellee/cross-appellant, Individual Healthcare Specialists, Inc.

Amy J. Farrar, Murfreesboro, Tennessee; and Hyland Hunt and Ruthanne M. Deutsch, Washington, D.C., for the amicus curiae, America's Health Insurance Plans.

Thomas Anthony Swafford and Rocklan W. King III, Nashville, Tennessee, for the amici curiae, the Nashville Area Chamber of Commerce, the Greater Memphis Chamber, and the Chattanooga Area Chamber of Commerce.

Lynda M. Hill and Katharine B. Fischman, Nashville, Tennessee, for the amicus curiae, the Tennessee Chamber of Commerce & Industry.

George T. Lewis, III, and Nicole D. Berkowitz, Memphis, Tennessee, for the amici curiae, Tennessee Defense Lawyers Association and DRI-The Voice of the Defense Bar.

John F. Kuppens, Chicago, Illinois, for the amicus curiae DRI-The Voice of the Defense Bar.

Professor George W. Kuney, Knoxville, Tennessee, amicus curiae.

## OPINION

### FACTUAL AND PROCEDURAL BACKGROUND

### Overview

Plaintiff/Appellee Individual HealthCare Specialists, Inc., (IHS) is an insurance agency based in Brentwood, Davidson County, Tennessee. From 1999 to 2012, IHS sold insurance policies for Defendant/Appellant BlueCross BlueShield of Tennessee, Inc. ("BlueCross"), and BlueCross paid IHS commissions on the sales.[1] The parties' commission arrangement was governed by a General Agency Agreement. This lawsuit stems from IHS's claim that BlueCross breached the Agency Agreement and owes IHS substantial damages resulting from that breach.

### General Agency Agreement

In 1999, IHS and BlueCross executed their first General Agency Agreement ("1999 Agency Agreement"). In 2009, almost ten years later, the parties renewed their contract by executing a superseding General Agency Agreement ("2009 Agency Agreement"). The two agreements (collectively, the "Agency Agreements") were substantially similar to one another.

Generally, the Agency Agreements authorized IHS to solicit applications for BlueCross's individual hospital, surgical, medical, and supplemental insurance policies. They contemplated that IHS would use both in-house agents and outside brokers, known as "producing agents" or "subagents," to solicit applications for BlueCross policies. Under the Agency Agreements, IHS was responsible for hiring, supervising, and terminating the subagents. It was also responsible for ensuring that the subagents were in compliance with Tennessee laws and regulations as well as BlueCross's policies and procedures. The Agency Agreements stated expressly that IHS and its subagents were considered independent contractors of BlueCross, not employees.

---

[1] In the late 1990s, BlueCross began to sell individual (as opposed to group) insurance products in Tennessee. Rather than hiring employees and taking on the administrative tasks involved in such a venture, it contracted with general agents to sell the individual insurance products either directly or through a network of subagent brokers. IHS was one such general agent.

BlueCross paid IHS two types of commissions: (1) first-year commissions and (2) renewal commissions. First-year commissions were based on the premiums paid on insurance policies in the year they were sold; renewal commissions were based on the premiums paid for the renewal of existing policies. The specific commission rates payable by BlueCross were set forth in commission schedules attached as addenda to each of the Agency Agreements and incorporated into the agreements by reference. The attached commission schedules stated separate rates for first-year and renewal commissions for specified BlueCross insurance products.[2] In the event of a conflict between the commission schedule and the Agency Agreement to which it was attached, the terms of the Agency Agreement would control.

In this lawsuit, IHS claims that BlueCross breached several provisions in the Agency Agreements and also breached a modified commission schedule dated May 1, 2011. The relevant Agency Agreement provisions will be set forth later in this opinion, with the legal analysis related to that provision. Suffice it to say at this juncture that IHS sought damages under Article XII ("the Compensation provision") and attorney fees under Article VI ("the Indemnity provision"). Those claims also implicate Article XIV ("the Termination provision") and Article X ("the Integration clause"). The controversy surrounding BlueCross's alleged breach of the May 1, 2011 commission schedule requires some preliminary explanation.

### Commission Schedules and the May 2011 Schedule

As we have stated, each Agency Agreement had an attached commission schedule containing the applicable commission rates for policies sold. Each commission schedule included bolded language at the bottom of the document indicating that the commission schedules were subject to unilateral change by BlueCross with appropriate notification to IHS: "[BlueCross] reserves the right to modify or change the commission and payment schedules with appropriate notification."

On several occasions, BlueCross exercised its right to modify the commission schedules under both Agency Agreements.[3] Each modified commission schedule

---

[2] BlueCross paid IHS different rates according to the type of policy issued, and the rate was a percentage of the policy's first-year annualized premium.

[3] The record indicates that BlueCross modified the Commission Schedule attached to the 1999 Agency Agreement in April 2004, June 2005, October 2005, January 2006, December 2006, June 2008, and November 2008. The record further indicates that BlueCross modified the Commission Schedule attached to the 2009 Agency Agreement in February 2010 and May 2011.

included the same language reserving to BlueCross "the right to modify or change the commission and payment schedules with appropriate notification." They also included the same provision stating that, in the event of a conflict between the commission schedule and the Agency Agreement, "then the terms of the Agency Agreement will control." With the notable exception of the last commission schedule, effective on May 1, 2011 (which is at issue in this lawsuit), each modified commission schedule included the following language: "This Commission Schedule supplements any previous Commission Schedule you may have received; *commissions for products previously sold are governed by the Commission Schedule in place at the time the sale was made.*" (Emphasis added).

In February 2011, BlueCross notified IHS of a new commission schedule that would become effective on May 1, 2011 (the "May 2011 Schedule"). BlueCross said that the new commission schedule was necessitated by the Affordable Care Act, enacted the previous year in March 2010.[4]

The May 2011 Schedule significantly reduced commission rates for IHS and its subagents.[5] It also omitted the provision in previous schedules stating it would "supplement[] any previous Commission Schedule" and instead said it would "replace any previous Commission Schedule." The new schedule also omitted the language in previous schedules stating that "commissions for products previously sold are governed by the Commission Schedule in place at the time the sale was made" and instead said: "Commissions on sold or renewed [BlueCross] products that have effective dates on or after May 1, 2011[,] shall be paid in accordance with the terms and conditions set forth" in the new schedule. In other words, the May 2011 Schedule said its reduced commission rates applied not only to first-year policies but also to renewals of policies sold prior to May 1, 2011.

---

[4] According to Amicus Curiae America's Health Insurance Plans, "[t]he ACA provision that most directly affects arrangements between health insurance providers and agents or brokers is called the medical loss ratio, which took effect in 2011. *See* 42 U.S.C. [§] 300gg-18(b); 45 C.F.R. Part 158." The medical loss ratio (MLR) under the ACA was an 80% to 20% split; carriers could spend no more that 20% of insurance premiums on administrative costs, including commission payments.

[5] The May 2011 Schedule also included a provision that addressed the division of commissions between IHS and its subagents for renewal premiums. It first stated that IHS would receive 7% commission on renewal premiums collected from May 1, 2011, to April 30, 2012. It then directed IHS to pay its subagents 5% of that commission and to retain 2% of the commission as its "override." On May 1, 2012, it provided, the commission on renewal premiums would fall to 5%.

In roughly the same time frame, BlueCross and IHS discussed the possibility of BlueCross purchasing IHS based on a yet-to-be-determined multiple of IHS's projected annual commission revenue. These discussions prompted the President of IHS, James Walker, to undertake to project IHS's annual revenue. In the course of designing a computer model to project the revenue, Mr. Walker began to suspect that IHS was being underpaid by BlueCross. After an internal analysis of IHS records, Mr. Walker concluded that BlueCross had been systemically underpaying commissions owed to IHS since the inception of their contractual relationship in 1999.

## Lawsuit and Termination of Agency Agreement

### *Complaint*

On July 29, 2011, IHS filed the instant lawsuit against BlueCross. The complaint asserted that BlueCross breached the Agency Agreements by systemically underpaying IHS's commissions since 1999. Over the course of the parties' contractual relationship, IHS said, these systemic underpayments totaled over $15 million. IHS further claimed BlueCross had "wrongfully concealed the true amounts of First Year Commissions and Renewal Commissions from it, thereby tolling any applicable statute of limitations which might otherwise have been applicable" to the systemic-underpayment claims. Alternatively, IHS asserted claims for unjust enrichment and conversion based on the systemic underpayments. It asked the trial court to order an accounting so that it could determine the amount of commissions BlueCross should have paid IHS over the years. In addition, IHS claimed BlueCross breached the 2009 Agency Agreement by issuing the May 2011 Commission Schedule and including a provision that unilaterally reduced the rates paid on renewal commissions for existing policies. Finally, IHS sought attorney fees incurred in the lawsuit pursuant to the indemnity provision in the 2009 Agency Agreement.

### *Termination*

In November 2011, BlueCross told IHS it was terminating the 2009 Agency Agreement "without cause" effective February 23, 2012. BlueCross advised IHS that, after February 23, 2012, IHS would "no longer be entitled to receive commission payments." In doing so, BlueCross effectively "cut out the middleman" and paid all commissions after the termination date directly to the subagent associated with each policy. Based on this turn of events, IHS amended its complaint to include an allegation that BlueCross breached the 2009 Agency Agreement by refusing to pay post-termination commissions to IHS.

- 6 -

*IHS's Motion for Partial Summary Judgment*

In November 2012, IHS filed a motion for partial summary judgment. The motion asserted that, based on the plain language of the parties' agreements and the undisputed facts, BlueCross breached the 2009 Agency Agreement by unilaterally reducing the renewal commission rates on existing policies in the May 2011 Schedule and by refusing to pay commissions to IHS after BlueCross terminated the 2009 Agency Agreement. In addition, IHS claimed it was entitled to judgment as a matter of law for its expenses, attorney fees, and costs incurred in bringing the action, pursuant to the indemnity provision in the 2009 Agency Agreement.

In January 2013, the trial court entered an order denying IHS's motion for partial summary judgment. The order stated at the outset that, because "these claims are a matter of contract construction and, therefore, a matter of law, they are appropriate for summary judgment analysis." The trial court held that, although "there are no genuine issues of material fact and no ambiguities in the parties' contract documents [that] preclude a summary judgment determination on the issues presented, nevertheless the Court concludes summary judgment cannot be granted. [IHS] has not demonstrated that its contract construction should prevail." Interpreting the contractual language, the trial court determined that: (1) BlueCross's unilateral reduction of commission rates for first-year commissions and renewal commissions did not constitute a breach of the 2009 Agency Agreement because the May 2011 Schedule permitted BlueCross to make such unilateral modifications; (2) BlueCross's payment of commissions directly to subagents did not constitute a breach of the 2009 Agency Agreement because, once the 2009 Agency Agreement was terminated, IHS was no longer "entitled" to receive the commissions; and (3) BlueCross was not obligated to pay IHS's attorney fees under the indemnity provision in the 2009 Agency Agreement. In addition, the trial court granted IHS's motion to access BlueCross's records and ordered an accounting "to enable [IHS] to determine whether [BlueCross] has correctly calculated and paid commissions."

In April 2013, the trial court entered an order denying IHS's motion to revise the January 2013 order and reaffirmed its ruling. After this decision, the parties engaged in extensive additional discovery.

*BlueCross's Motion for Partial Summary Judgment*

Almost two years later, in December 2014, BlueCross filed its own motion for partial summary judgment. In its motion, BlueCross contended it was entitled to

judgment as a matter of law on the same claims that were the subject of IHS's motion for partial summary judgment. In addition, BlueCross claimed it was entitled to judgment as a matter of law on the breach-of-contract/systemic-underpayment claims that accrued prior to July 29, 2005, as well as the unjust enrichment and conversion claims that accrued prior to July 29, 2008, based on the applicable statute of limitations.[6] BlueCross argued that IHS could not prove a fraudulent-concealment exception to the statute-of-limitations defense because all along IHS had had the information necessary to be on notice of its right to recover based on those theories. In support of its motion, BlueCross attached a statement of undisputed material facts as well as excerpts and exhibits from several depositions and other documents obtained through discovery.

In response to BlueCross's motion, IHS submitted extrinsic evidence to support its interpretation of the contract. Specifically, IHS submitted the testimony of three former BlueCross employees who had been involved in the making of the parties' contracts—John Gage Gray, Jr., John Sellers, and Don Lawhorn. These witnesses testified about the circumstances surrounding the contract and expressed their general understanding on behalf of BlueCross that (1) the 1999 Agency Agreement prohibited BlueCross from modifying renewal commission rates on existing BlueCross policies, and (2) the indemnification clause in the 2009 Agency Agreement requires indemnification for attorney fees in contractual disputes between IHS and BlueCross.

In February 2015, the trial court entered an order denying BlueCross's motion for partial summary judgment. The trial court acknowledged that, in its ruling on the IHS motion, it had characterized the contractual provisions at issue as unambiguous. However, it pointed out that, at that time, the declarations of the three BlueCross former employees had not yet been filed. As to BlueCross's motion, the trial court held, the witnesses' declarations created a genuine issue of fact as to the parties' intent behind their agreements: "[IHS] has provided the Court declarations of three former employees of Defendant. The employees were intimately involved with the negotiation and drafting of the General Agency agreements and addenda, whose construction is at issue here on summary judgment." This evidence, the trial court reasoned, was relevant and supported the argument that "the parties mutually intended and agreed to the contract language to having the meaning asserted by [IHS]." In support of this rationale, the trial court relied in part on the reasoning in *Pacific Gas and Electric Co. v. G.W. Thomas Drayage & Rigging Co.*, 442 P.2d 641 (Cal. 1968) ("*Pacific Gas*"), in which the California Supreme

---

[6] The statute of limitations for breach-of-contract actions is six years, *see* Tenn. Code Ann. § 28-3-109(a)(3) (2017), and the statute of limitations for unjust enrichment (as asserted in this lawsuit) and conversion is three years, *see* Tenn. Code Ann. § 28-3-105(2) (2017).

Court said that, to ensure construction of contracts in accordance with the parties' intent, courts should consider evidence of context, surrounding circumstances, and purposes of a contract even if the contractual language initially appears unambiguous. *See id.* at 644-45. On this basis, the trial court denied BlueCross's motion for partial summary judgment. The trial court also determined that there were genuine issues of material fact on BlueCross's statute-of-limitations defense, so it denied summary judgment on that issue as well.

*Trial*

A bench trial commenced on April 27, 2015. The trial court heard the testimony of numerous witnesses.

One of IHS's first witnesses was James Walker, the President of IHS. During his testimony, BlueCross repeatedly objected to questions and documents relating to Mr. Walker's understanding of the terms and provisions of the parties' agreements. BlueCross argued that this testimony was inadmissible in light of the integration clause in the parties' 2009 Agency Agreement and the parol evidence rule, which generally prohibits the use of extrinsic evidence of pre-contract negotiations in order to vary or contradict the terms of a fully integrated contract.

On April 29, 2015, two days into the trial, the trial court issued an order overruling BlueCross's objections and admitting the evidence regarding Mr. Walker's understanding of the parties' agreements. As it had in the order denying BlueCross's motion for partial summary judgment, the trial court cited the reasoning in *Pacific Gas*. The trial court also cited 17A Am. Jur. 2d *Contracts* § 394 (Feb. 2015) for the proposition that, to determine "the meaning of an ambiguous or uncertain contract," the court "may have recourse, not only to the wording of and context of the agreement, but also to the circumstances under which it was made, and to the conferences and correspondence between the parties pending the negotiation of the final agreement." (Quoting 17A Am. Jur. 2d *Contracts* § 394). The trial court considered these authorities to be well reasoned and consistent with Tennessee law.

The trial proceeded on intermittent non-consecutive days over the ensuing months, concluding on June 30, 2015. The trial court then took the case under advisement.

On September 3, 2015, the trial court issued a Memorandum and Order of Trial Findings of Fact and Conclusions of Law. Relying on the text of the 2009 Agency Agreement and the testimony offered by IHS, the trial court held that BlueCross breached

- 9 -

the agreement by: (1) applying the May 2011 reduced commission rates to policies that were already in effect; (2) paying post-termination commissions directly to subagents rather than IHS, and (3) systemically underpaying IHS commissions during the entirety of the parties' 13-year relationship by virtue of BlueCross's flawed commission accounting system. The trial court rejected BlueCross's statute-of-limitations defense to the pre-July 29, 2005 systemic commission underpayments. Although BlueCross "did not commit fraudulent concealment," the trial court held that the underpayments were "inherently undiscoverable," so it applied the discovery rule to toll the statute of limitations on IHS's claims. *See Goot v. Metro. Gov't of Nashville & Davidson Cnty.*, No. M2003-02013-COA-R3-CV, 2005 WL 3031638, at *11 (Tenn. Ct. App. Nov. 9, 2005).

The trial court awarded IHS $1,968,765 in damages for BlueCross's systemic commission underpayments. The court also awarded IHS $142,735 in prejudgment interest, for a total judgment of $2,111,500.[7] The trial court denied IHS's claim for damages based on the reduction of the renewal commission rate on existing policies, citing insufficient evidence. It held, however, that "on an ongoing basis [BlueCross] must pay the going rate at the time the policy became effective . . . and must pay the commissions to [IHS] who pays the subagents directly." The trial court rejected IHS's claim for attorney fees arising out of the indemnity provision in the parties' 2009 Agency Agreement; it concluded that the indemnity provision does "not apply to a contract dispute between the contracting parties; it applies to third-party claims." The court also dismissed IHS's claims for conversion and unjust enrichment.

*Motions to Alter or Amend*

Both parties moved to alter or amend the court's order. BlueCross argued that it was error for the trial court to award IHS substantial damages without reducing the damage award by the amount of the commissions BlueCross had already paid IHS's subagents. For its part, IHS asked the court to reconsider its holding that IHS was not entitled to attorney fees under the indemnity provision.

On December 22, 2015, the trial court entered an order denying BlueCross's motion in its entirety. However, the court granted IHS's motion and reversed its denial of the request for attorney fees. Based on the extrinsic evidence on the parties' intent when they entered into the contract, along with legal authorities cited by IHS in support

---

[7] The trial court denied damages for many of IHS's claims based on lack of sufficient proof. These holdings are not at issue in this appeal.

- 10 -

of its interpretation of the indemnity provision, the trial court held IHS was entitled to recover its attorney fees in this lawsuit. It decided to hold in abeyance its decision on the amount of fees to be awarded pending an appeal. Thereafter, the trial court certified its order as a final judgment pursuant to Rule 54.02 of the Tennessee Rules of Civil Procedure. BlueCross appealed.

*Court of Appeals*

The Court of Appeals affirmed all of the trial court's rulings except its ultimate decision regarding attorney fees. *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.*, No. M2015-02524-COA-R3-CV, 2017 WL 2105988, at *28 (Tenn. Ct. App. May 15, 2017), *perm app. granted* (Tenn. Oct. 4, 2017) (hereinafter "*IHS*"). The intermediate appellate court affirmed the trial court's conclusion regarding BlueCross's unilateral renewal-rate changes on existing policies based on the rule of practical construction: "[W]e believe the parties' conduct for the first eleven years of their relationship shows that, at the time of contracting, they intended the commission rates to be 'vested' for existing insurance policies and that each modification would apply prospectively." *Id.* at *9. The intermediate appellate court also affirmed the holding that BlueCross breached the 2009 Agency Agreement by paying commissions directly to the subagents after the contract was terminated because IHS remained able, entitled, and available to receive such payments. *Id.* at *10. In addition, it affirmed the trial court's rejection of BlueCross's statute-of-limitations defense and its application of the discovery rule to IHS's commission underpayment claims because BlueCross's breach was inherently undiscoverable. *Id.* at *12-13.

Regarding attorney fees, however, the appellate court reversed. It held that "the trial court erred by considering extrinsic evidence, and by going beyond the 'four corners' of an integrated contract, to ascertain whether the right to recover attorney's fees under the indemnification provision applied to a dispute between the contracting parties." *Id.* at 22. Based on the plain language of the indemnity provision, the intermediate appellate court reversed the award of attorney fees. *Id.* at *28.

We granted both parties' applications for permission to appeal.

**ISSUES ON APPEAL**

On appeal, BlueCross asserts that the trial court erred in holding that the 2009 Agency Agreement (1) precluded BlueCross from applying new renewal commission rates to existing insurance policies, (2) precluded BlueCross from paying commissions

directly to IHS's subagents after termination of the agreement, and (3) provided for an award of attorney fees for suits between the contracting parties. BlueCross further argues that the lower courts erred in applying the discovery rule in a breach-of-contract action. Even if the discovery rule were applicable, BlueCross contends, the lower courts erred in holding that the systemic commission underpayments alleged by IHS were inherently undiscoverable.

IHS argues in this appeal that the trial court was correct in holding that BlueCross breached the 2009 Agency Agreement by retroactively reducing renewal commission rates on existing policies and by paying commissions directly to IHS subagents after the termination of the parties' agreement. IHS also asserts that the Court of Appeals erred in reversing the trial court's award of attorney fees under the indemnity provision in the 2009 Agency Agreement. Finally, IHS contends that the lower courts were correct in applying the discovery rule and in holding that IHS is entitled to recover for BlueCross's underpayments over the entire course the parties' contractual relationship.

We consider first the arguments relating to the breach-of-contract claims, focusing initially on the use of extrinsic evidence to interpret contracts. We will then consider whether the discovery rule may be applied to toll the six-year statute of limitations in this breach-of-contract action.

## ANALYSIS

### Contract Interpretation and Extrinsic Evidence

In this appeal, BlueCross asserts globally that the trial court erred in admitting extrinsic evidence to construe the parties' agreements. It maintains that all of the contractual provisions at issue were clear and unambiguous on the face of the document, noting that the trial court said as much in its order denying IHS's motion for partial summary judgment, in which it found "no ambiguities in the parties' contract documents." Having made that threshold determination, BlueCross insists, the trial court was thereafter obliged to reject IHS's request to admit extrinsic evidence on the proper interpretation of the agreements and instead look only to the written agreements themselves. From a policy standpoint, BlueCross argues that, for contracts that include an integration clause, this Court should require trial courts to interpret contracts based on their written language only, without resort to extrinsic evidence.[8]

---

[8] Amici Curiae Tennessee Chamber of Commerce & Industry, The Nashville Chamber of Commerce, the Greater Memphis Chamber, and the Chattanooga Chamber support this policy position as

IHS argues the inverse. It maintains that the testimony on the parties' intent and their course of dealing over the years was key to proper interpretation of the agreements. IHS maintains that the Court of Appeals erred in holding that the trial court should have excluded extrinsic evidence on the question of whether IHS was entitled to an award of attorney fees under the indemnification provision. A strict "plain meaning" rule that precludes the use of extrinsic evidence, it contends, is at odds with the courts' obligation to interpret contracts in a way that comports with the parties' intent.[9]

As explained in more detail below, in so framing their arguments, it can be said that BlueCross urges us to adopt a "textual" approach to contract interpretation while IHS advocates for a "contextual" approach. As the name suggests, the textual approach is text-centered; under it, the court interprets a contract by focusing on the plain meaning of the text, ascertained from the written agreement only, to the exclusion of any evidence extrinsic to it. In contrast, under the contextual approach, the court interprets a contract based on a broad understanding of the context of the agreement and the parties' intent, taken from evidence of extrinsic matters such as the circumstances of their negotiation. *See generally* Lawrence A. Cunningham, *Contract Interpretation 2.0: Not Winner-Take-All but Best-Tool-for-the-Job*, 85 Geo. Wash. L. Rev. 1625 (Nov. 2017) (hereinafter "Cunningham, 85 Geo. Wash. L. Rev. at ___"); Ronald J. Gilson, Charles F. Sabel, & Robert E. Scott, *Text and Context: Contract Interpretation as Contract Design*, 100 Cornell L. Rev. 23 (Nov. 2014) (hereinafter "Gilson et al., 100 Cornell L. Rev. at ___").

We first offer some background on how these two competing approaches to contract interpretation and extrinsic evidence evolved. Next we review how Tennessee courts have used them, with particular focus on the parol evidence rule. Finally, we apply the appropriate law to the facts in this case.

*Historical Overview*

"Historically, the English common law applied two different sets of doctrines to interpret a disputed contract." Gilson et al., 100 Cornell L. Rev. at 46. In the law courts, contracts were enforced in accordance with a set of objective rules. A precursor to the

---

conducive to predictable outcomes in business disputes and an overall favorable business climate. *See IHS*, 2017 WL 2105988, at *18-19 (summarizing the amici positions).

[9] Amicus Curiae Professor George Kuney is in general alignment with this position, arguing that a court's consideration of the context of an agreement as well as its language is more likely to result in interpretation that reflects the intentions of the parties.

- 13 -

textual approach, this formalistic method focused on the text of the contract at issue without reference to any evidence outside of the written document. *Id.* at 47. The objective rules or doctrines "were administered strictly, without exceptions for cases in which the application of the rule appeared to defeat its purpose." *Id.*

In contrast, the English chancery courts, courts of equity, interpreted contracts by applying broad equitable principles that were "administered loosely and [] designed to provide exceptions to the common law interpretive rules." *Id.* The equitable principles "were generally cast in subjective terms and therefore required judges to exercise such judgment by evaluating the context of the particular transaction." *Id.*

Over time, the chancery courts and the common law courts began to exercise overlapping jurisdiction in contractual disputes; however, each tribunal continued to view cases from its own perspective. *Id.* (quoting J.H. Baker, An Introduction to English Legal History 12-14 (4th ed. 2002)). The two competing systems often had "incompatible procedural and substantive doctrines." *Id.* at 48-49. Eventually, courts of law and courts of equity were merged in England and in the United States. "The result was an uncomfortable combination of legal and equitable doctrines; and it was this awkward amalgam that formed the matrix of American contract law." *Id.* at 49.

Roughly up to the middle of the twentieth century, most American courts predominantly applied the textual approach to contract interpretation, rejecting all evidence extrinsic to the written document. Cunningham, 85 Geo. Wash. L. Rev. at 1628. The textual approach is essentially based on three familiar rules of contract interpretation: the plain meaning rule,[10] the four corners rule,[11] and the parol evidence rule.[12] All of these limit the use of extrinsic evidence in contract interpretation.[13]

---

[10] In general, under the plain meaning rule, if language in a contract is initially deemed unambiguous, its "plain meaning" should be used, without recourse to matters extraneous to the text of the agreement. *See* Black's Law Dictionary 1336 (10th ed. 2014).

[11] As discussed below, the four corners rule appears to be stated in two ways; first, that a contract's meaning is gathered from the entire document rather than its isolated parts, and second, that extraneous evidence is not used to interpret a contract that is deemed unambiguous. *See* Black's Law Dictionary 772 (10th ed. 2014).

[12] Formulations of the so-called "parol evidence rule" vary, but in general it provides that "a writing intended by the parties to be a final embodiment of their agreement cannot be modified by evidence of earlier or contemporaneous agreements that might add to, vary, or contradict the writing." Black's Law Dictionary 1292 (10th ed. 2014).

A widely-cited New York case provides an example of the strict textualist approach. In *Hotchkiss v. National City Bank of New York*, 200 F. 287 (S.D.N.Y. 1911), the New York court refused to consider witness testimony on custom associated with a contract, stating that the witness's testimony was "not competent evidence at all, since it in effect usurps the court's function." *Hotchkiss*, 200 F. at 293. Rejecting all extrinsic evidence, the court explained: "A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties."[14] *Id*.

In the mid-twentieth century, jurists and scholars began to question strict adherence to the textual rules. Professor Arthur Corbin, a well-known scholar and author of a popular contracts treatise, wondered, "How could any writing prove its own completeness and how can any word or document prove its own meaning[?]" Cunningham, 85 Geo. Wash. L. Rev. at 1628. Corbin and like-minded jurists advocated a broader approach. "Start with the writing," they urged, "but determine meaning according to all probative circumstances," including extrinsic evidence such as the structure of the contract, the parties' bargaining history, the circumstances surrounding the formation of the contract, and the parties' course of performance.[15] *Id*.

In response, a number of jurists moved toward what came to be known as a contextual approach. In a widely-cited example, the California Supreme Court in *Pacific Gas*, cited by the trial court below, embraced broad use of interpretive extrinsic evidence. 442 P.2d at 644-46. In *Pacific Gas*, the trial court had held that the parties' contract had

---

[13] The term "extrinsic evidence" includes any "[e]vidence relating to a contract but not appearing on the face of the contract because it comes from other sources, such as statements between the parties or the circumstances surrounding the agreement." Black's Law Dictionary 675 (10th ed. 2014). Unless a particular type of extrinsic evidence is at issue, courts often refer to all extra-contractual evidence as "extrinsic evidence."

[14] The sometimes harsh results resulting from the textual rules engendered numerous exceptions to rigid enforcement. *See, e.g.*, *Hines v. Wilcox*, 33 S.W. 914, 914-15 (Tenn. 1896) (listing multiple exceptions to the parol evidence rule).

[15] In addition, some judges and commentators came to criticize the "ambiguous versus unambiguous" dichotomy used in textualism an arbitrary barrier to the use of important tools for interpreting contracts and statutes. *See* Lawrence M. Solan, *Pernicious Ambiguity in Contracts and Statutes*, 79 Chi.-Kent L. Rev. 859, 859 (2004) ("The problem, perhaps ironically, is that the concept of ambiguity is itself perniciously ambiguous."); Ward Farnsworth et al., *Ambiguity About Ambiguity: An Empirical Inquiry into Legal Interpretation*, 2 J. Legal Analysis 257, 276 (2010) ("If one person says that both proposed readings of [legal text] seem plausible, and a colleague disagrees, finding one reading too strained, what is there to do about it but for each to stamp his foot?").

a "plain meaning" and thereafter refused to admit any extrinsic evidence to contradict its initial interpretation. *Id*. at 642. The California Supreme Court criticized the trial court's approach. "A rule that would limit the determination of the meaning of a written instrument to its four-corners merely because it seems to the court to be clear and unambiguous ," the *Pacific Gas* Court said, "would either deny the relevance of the intention of the parties or presuppose a degree of verbal precision and stability our language has not attained." *Id*. at 644. It held that, if extrinsic evidence shows that the contract language is susceptible to more than one meaning, it can be admitted to prove the parties' actual intent. *Id.* at 645.

The influence of contextualism found its way into the Restatement (Second) of Contracts. Cunningham, 85 Geo. Wash. L. Rev. at 1629. Section 202 of the Restatement, on rules of contract interpretation, provides that the words of the contract "and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." Restatement (Second) of Contracts § 202(1) (1981). Section 212, specifically applicable to integrated agreements, provides: "The interpretation of an integrated agreement is directed to the meaning of the terms of the writing or writings *in light of the circumstances* . . . ." Restatement (Second) of Contracts § 212(1) (1981) (emphasis added). The comments to section 212 explain that "extrinsic evidence cannot change the plain meaning of a writing," but the meaning of contractual terms "can almost never be plain except in a context." *Id.* § 212 comment b.

Thus, many elements of contextualism gained wide acceptance. "By the 1990s, . . . contextualism, [had] softened the parol evidence rule, loosened the four corners doctrine, and diluted the plain meaning rule." Cunningham, 85 Geo. Wash. L. Rev. at 1629.

However, as had happened at times with an overly rigid textualist approach, contextualism was also taken to extremes. Some courts took it as a license to disregard the written words of the contract. Under an extreme contextualist approach, if extrinsic evidence indicates that the contractual language does not comport with the intent of the parties, the court may "override" the text if "doing so is necessary to substantially 'correct' or complete the parties' written contract by realigning it with its 'true' meaning." Gilson et al., 100 Cornell L. Rev. at 36. This extreme application of contextualism prompted a correction of sorts, some resurgent support for textualism— particularly in commercial contracts.[16] Cunningham, 85 Geo. Wash. L. Rev. at 1629.

---

[16] *See, e.g.*, *Trident Ctr. v. Conn. Gen. Life Ins. Co.*, 847 F.2d 564, 569 (9th Cir. 1988); *Gen. Tire & Rubber Co. v. Firestone Tire & Rubber Co.*, 489 F.2d 1105, 1123-24 (6th Cir. 1973); *Alameda Cnty.*

Any attempt to discern where the modern majority of jurisdictions falls on the question of "textual versus contextual" approach to contract interpretation gives way to frustration because of "the reality that different settings warrant different approaches." Cunningham, 85 Geo. Wash. L. Rev. at 1627. In any given state, caselaw "evades tidy classification as textualist or contextualist because, rather than wedded to one school, courts often choose the more suitable doctrine given the interpretation task at hand." *Id.* & Appendix (comparing contradictory intra-jurisdiction cases); *see also* Eric A. Posner, *The Parol Evidence Rule, The Plain Meaning Rule and The Principles of Contractual Interpretation*, 146 U. Pa. L. Rev. 533, 553 (1998) ("No jurisdiction has a bright-line [parol evidence rule]. Courts might state one or the other as a general rule, but all sorts of subsidiary doctrines provide exceptions."). "Many differences in this juxtaposition can be explained on various, somewhat technical grounds—such as date, state versus federal law, high state court or low, degree of clarity, and so on. But ultimately the best explanation for these and innumerable other such apparent anomalies is the inherent untidiness of the cases." Cunningham, 85 Geo. Wash. L. Rev. at 1630.

As we explain below, Tennessee law took a somewhat different path than did most other states. Nevertheless, it has ended up in a similar place as much of the nation, with cases that include language reflecting both contextualist and textualist principles.

*Tennessee Law on Textual and Contextual Principles*

After a thorough review of Tennessee contracts caselaw, at least one commentator has characterized Tennessee contracts jurisprudence as "in deep conflict" on whether contract interpretation "should be content oriented, i.e., focused predominantly, with limited exceptions, on the four corners of the document, or context oriented, i.e., focused more leniently on the contract terms as well as the subject matter, the situation of the parties, the surrounding circumstances, and the parties' course of performance." Steven W. Feldman, 21 Tenn. Practice: Contract Law and Practice § 8:3 (June 2018) (hereinafter "Feldman, 21 Tenn. Practice § ___"). While this description may overstate a bit, we acknowledge that Tennessee's jurisprudence on contract interpretation cannot be neatly categorized as wholly textualist or wholly contextualist.

Tennessee's path to this point appears to be somewhat the converse of the path taken in much of the nation. As discussed below, looking at the broad sweep of cases, early Tennessee caselaw includes much language stressing context-based contract

---

*Flood Control & Water Conservation Dist. v. Dep't of Water Res.*, 213 Cal. App. 4th 1163, 1188-89 (2013).

interpretation, with elements of textualism as well. Over time, many came to feature textualist principles more prominently, while others continued to recite context-based analysis. A number of cases included both. This led to the current "untidiness." Cunningham, 85 Geo. Wash. L. Rev. at 1630. We will seek to provide some overview.

We first recognize the foundational principles in all of Tennessee contract law. The common thread in all Tennessee contract cases—the cardinal rule upon which all other rules hinge—is that courts must interpret contracts so as to ascertain and give effect to the intent of the contracting parties consistent with legal principles. *Wallis v. Brainerd Baptist Church*, 509 S.W.3d 886, 899 (Tenn. 2016); *Dick Broad. Co., Inc. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 659 (Tenn. 2013) ("*Dick Broadcasting*"); *Clark v. Sputniks, LLC*, 368 S.W.3d 431, 441 (Tenn. 2012); *Allmand v. Pavletic*, 292 S.W.3d 618, 630 (Tenn. 2009); *Allstate Ins. Co. v. Watson*, 195 S.W.3d 609, 611 (Tenn. 2006); *Frizzell Constr. Co. v. Gatlinburg, L.L.C.*, 9 S.W.3d 79, 85 (Tenn. 1999) (quoting *Bob Pearsall Motors, Inc. v. Regal Chrysler-Plymouth, Inc.*, 521 S.W.2d 578, 580 (Tenn. 1975)); *see also Colonial Pipeline Co. v. Nashville & E. R.R. Corp.*, 253 S.W.3d 616, 621 (Tenn. Ct. App. 2007).

Also foundational to our jurisprudence is the principle that the rules used for contract interpretation "have for their sole object 'to do justice between the parties, by enforcing a performance of their agreement according to the sense in which they mutually understood it at the time it was made.'" *McNairy v. Thompson*, 33 Tenn. 141, 149 (1853) (quoting *Chitty on Con.* 73); *see also Nunnelly v. Warner Iron Co.*, 29 S.W. 124, 127 (Tenn. 1895); *Mills v. Wm. Faris & Co.*, 59 Tenn. 451, 457 (1873); *Nashville & Nw. R.R. Co. v. Jones*, 42 Tenn. 574, 583 (1865). "Common sense must be applied to each case, rather than any technical rules of construction." *Barnes v. Black Diamond Coal Co.*, 47 S.W. 498, 499 (Tenn. 1898) (summarizing *Leonard v. Dyer*, 26 Conn. 172, 176-77 (1857)).

In the late 1800s, when the textual approach was in its heyday in the rest of the United States, the Tennessee Supreme Court often used broad language favoring the consideration of evidence of context—in connection with the contract's text—in order to determine the parties' intent. For example, in 1895, this Court stated that "[t]he intention is the governing principle of construction. In ascertaining the intention, the situation of the parties, the motives that led to the agreement, and the objects designed to be effected by it, may all be looked to by the court." *Nunnelly*, 29 S.W. at 127; *see also Taylor v. Neblett*, 51 Tenn. 491, 493 (1871) ("The governing principle of construction of contracts is the intention of the parties. The sense in which they mutually understood it is that which must control in its enforcement. To ascertain the intention of parties, it is

legitimate to look to their situation at the time and to the surrounding circumstances."); *Jones*, 42 Tenn. at 583 ("The governing principle of construction is the intention of the parties. That intention may be ascertained by looking to the situation of the parties, the motives which induced the agreement, and the object and purpose designed to be effected by it."). Some recited contextual principles after determining that the contract language was "ambiguous," *see, e.g.*, *Mills*, 59 Tenn. at 457-58, and others did so without first finding ambiguity, *see, e.g.*, *Nunnelly*, 29 S.W. at 127.

Some early cases directed courts to ascertain whether contractual language was "plain and unambiguous" for the purpose of determining whether the question of the contract's interpretation should be submitted to the jury.[17] For example, in *Barker v. Freeland*, the Court explained:

> It is an indisputable proposition that when a contract is in writing, and its meaning is plain and unambiguous, its interpretation is matter of law for the court; but when the writing is not plain and unambiguous, but is such as requires the aid of evidence, either to identify the subject-matter, or in order to ascertain the situation and surrounding circumstances, or the nature and quality of the subject-matter, and the evidence be conflicting, or such as admits of more than one conclusion, it is not error to submit the interpretation of the doubtful parts of the instrument, under proper instructions, to the jury.

*Barker v. Freeland*, 18 S.W. 60, 61 (Tenn. 1892); *see also Price v. Allen*, 28 Tenn. 703, 711 (1849) (holding that trial court erred in permitting jury to consider extrinsic evidence because there was no "uncertainty" as to "the object or extent of the agreement.").

Some early Tennessee cases not involving a jury recite textual principles and the threshold ambiguity determination, and at the same time note the importance of context evidence to interpretation. In *Perkins Oil Co. v. Eberhart*, the Court stated that "'[i]t is an indisputable proposition that when a contract is in writing, and its meaning is plain and unambiguous, its interpretation is a matter of law for the court.' But when the writing is not plain, and unambiguous, parol evidence is admissible to ascertain the situation and surrounding circumstances, the nature and quality of the subject-matter, etc." 64 S.W.

---

[17] Deciding the legal effect of the words in a contract is a question of law, but where interpretation of the contract involves extrinsic evidence that "is conflicting or may lead to more than one conclusion, the doubtful parts may be submitted to the fact-finder for resolution." *Bratton v. Bratton*, 136 S.W.3d 595, 601-02 (Tenn. 2004) (citing *Barker*, 18 S.W. at 61).

760, 762 (Tenn. 1901). The *Perkins Oil* Court then added: "The sole object of the rules and principles laid down for the exposition of contracts is to . . . enforce[e] a performance of their agreement according to the sense in which they mutually understood it at the time. In ascertaining the intention, the situation of the parties, the motives that led to the agreement, and the objects designed to be effected by it may all be looked to by the court." *Id*.

Into the 1900s, the Tennessee Supreme Court continued to use language that emphasized the importance of context evidence to contract interpretation, even where the contract's terms initially appeared clear on the face of the document. In *Staub v. Hampton*, 101 S.W. 776 (Tenn. 1907), the Court stated at the outset that the description contained in the disputed deed appeared "perfectly clear upon its face," but it acknowledged that evidence presented to the Court "necessitates an inquiry into matter dehors [outside]" the document itself. *Id*. at 780. The Court said that the extrinsic evidence revealed an ambiguity not apparent from the document alone, termed a "latent ambiguity," explaining, "It is true that on the face of the deed alone, . . . no question arises; but, when . . . necessary inquiries are made, an ambiguity at once starts forth." *Id*. *Staub* used broad language on the use of extrinsic evidence of context. As to practical construction, the court said that extrinsic evidence of how the parties viewed and performed the contract "is always admitted, and is entitled to weight. There is no better test of the intention of the instrument. . . . Safer testimony can hardly be presented in relation to any transaction occurring in human affairs." *Id*. at 785. Similarly, evidence of "the attendant and surrounding circumstances" at the time the contract was made is "competent . . . for the purpose of placing the court in the same situation, and giving it the same advantages, for construing the paper which were possessed by the actors themselves." *Id*. (quoting *Cavazos v. Trevino*, 73 U.S. 773, 784-85 (1867)). The Court emphasized that evidence of the circumstances surrounding the execution of a contract is essential in contract construction:

> "[C]ourts, in the construction of contracts, look to the language employed, the subject-matter, and the surrounding circumstances. They are never shut out from the same light which the parties enjoyed when the contract was executed, and in that view they are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and of the correct application of the language to the things described."

*Id*. (quoting *Nash v. Towne*, 72 U.S. 689, 699 (1866)); *see also Hibernia Bank & Tr. Co. v. Boyd*, 48 S.W.2d 1084, 1086 (Tenn. 1932) ("[I]t appears that the excluded evidence was offered for the particular purpose of proving the intention of the parties in the execution of the agreement. . . , the motive which induced it, and the object and purpose designed to be effected by it, in order that the court might give effect to the agreement as the parties intended it. For this purpose the evidence . . . was competent."); *S. Ry. Co. v. Bacon*, 159 S.W. 602, 602 (Tenn. 1913) ("Contracts must be construed with reference to the situation and surroundings of the parties, the nature of the business in which they are engaged and to which the contract relates, and also with reference to the subject-matter."); *Hardwick v. Am. Can Co.*, 88 S.W. 797, 801 (Tenn. 1905) (similar).

During this same time period, however, Tennessee courts also cited textualist principles in strong terms. For example, in *McKay v. Louisville & Nashville Railroad Co.,* 182 S.W. 874 (Tenn. 1916), the Court held that there was "no need in this case to resort to extrinsic evidence in the construction of the contract. Its terms are wholly free from ambiguity." *Id*. at 875. In *Barretsville Bank & Trust Co. v. Bolton*, 187 S.W.2d 306 (Tenn. 1945), the Court indicated that evidence of surrounding circumstances should be considered if there was ambiguity: "The purpose of interpreting an instrument is to see what is the intention expressed by the words used. If from the imperfection of language it is impossible to know what the intention is without inquiring further, then see what the circumstances were with reference to which the words were used, and what was the object, appearing from those circumstances, which the persons using them had in view." *Id*. at 310 (quoting *Holmes v. Elder*, 94 S.W.2d 390, 392 (Tenn. 1936)). In *Petty v. Sloan*, 277 S.W.2d 355 (Tenn. 1955), the Court stated:

> It is . . . the contention of the appellants that if a contract is plain and unambiguous it is a question of law and it is the function of the court to interpret the contract as written—according to its plain terms. It was their contention also that the intention of the parties is expressed by the language of the contract when used in an unambiguous instrument and must be given effect though it was not actually the intention entertained by one or more of the parties to the contract. These contentions are well supported by numerous authorities in this State.

*Id*. at 358 (citations omitted).

Over time, Tennessee contract cases more often relied on textualist principles, emphasizing the importance of grounding contract interpretation in the written words of the agreement. For example, many indicate that a court should seek to ascertain the

intent of the parties from "the usual, natural, and ordinary meaning of the contractual language," and if the contractual language is initially deemed unambiguous,[18] its "plain meaning" should be used, without recourse to matters extraneous to the text of the agreement. *See, e.g.*, *Planters Gin Co. v. Fed. Compress & Warehouse Co.*, 78 S.W.3d 885, 890 (Tenn. 2002) ("The intent of the parties is presumed to be that specifically expressed in the body of the contract."); *see also BSG, LLC v. Check Velocity, Inc.*, 395 S.W.3d 90, 93 (Tenn. 2012); *City of Cookeville ex rel. Cookeville Reg'l Med. Ctr. v. Humphrey*, 126 S.W.3d 897, 903 (Tenn. 2004) (quoting *Guiliano*, 995 S.W.2d at 95); *Bob Pearsall Motors, Inc.*, 521 S.W.2d at 580 (contractual language should be understood in its plain, ordinary and popular sense, and if contract is unambiguous, it should be enforced as written); *Pac. Mut. Life Ins. Co. v. Walt*, 277 S.W.2d 434, 436 (Tenn. 1955) (similar); *Petty*, 277 S.W.2d at 359 (similar). Some add that, if the contractual language is deemed to be "plain, complete, and unambiguous," then the parties' intent is "'gathered from that language, and from that language alone, . . .'" *Empress Health & Beauty Spa, Inc. v. Turner*, 503 S.W.2d 188, 190 (Tenn. 1973) (quoting 17 Am. Jur. 2d, *Contracts* § 245).[19]

---

[18] Ambiguous in this sense is typically defined as "susceptible to more than one reasonable interpretation." *Planters Gin*, 78 S.W.3d at 890; *BSG, LLC*, 395 S.W.3d at 93.

[19] The "four corners" rule has been recited in various ways in Tennessee, sometimes as a rule of construction requiring the court to consider all parts of a contract, and other times as a variant of the "plain and unambiguous" principle described above; at times both have appeared in the course of the same opinion. For example in *Kiser v. Wolfe*, the Court stated: "When construing an insurance contract, 'the paramount rule . . . is to ascertain the intent of the parties . . . [which] is to be derived from the four corners of the policy giving effect to all parts.' 'An elementary precept of contract law' is that when the language is clear, courts must not look beyond the four corners of the instrument." *Kiser v. Wolfe*, 353 S.W.3d 741, 748 (Tenn. 2011) (citations omitted) (quoting *Blue Diamond Coal Co. v. Holland-Am. Ins. Co.*, 671 S.W.2d 829, 833 (Tenn. 1984) and *Whitehaven Cmty. Baptist Church v. Holloway*, 973 S.W.2d 592, 596 (Tenn. 1998)); *see also Dick Broad. Co.*, 395 S.W.3d at 659 ("We initially determine the parties' intent by examining the plain and ordinary meaning of the written words that are 'contained within the four corners of the contract.'") (quoting *84 Lumber Co. v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011) and citing *Kiser*, 353 S.W.3d at 748); *Ray Bell Const. Co., Inc. v. Tenn. Dept. of Transp.*, 356 S.W.3d 384, 387 (Tenn. 2011) ("If the contract language is unambiguous, then the parties' intent is determined from the four corners of the contract."); *Frizzell*, 9 S.W.3d at 85("No single clause in a contract is to be viewed in isolation; rather, the contract is to be viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illuminate another."). This lack of consistency in the description of the "four corners" rule is apparently not unique to Tennessee. As noted above, Black's Law Dictionary contains two definitions: "1. The principle that a document's meaning is to be gathered from the entire document and not from its isolated parts. 2. The principle that no extraneous evidence should be used to interpret an unambiguous document." Black's Law Dictionary 772 (10th ed. 2014).

As contract cases came less often to be tried before a jury, later Tennessee cases continued to recite the threshold ambiguity determination without reference to questions suitable to be considered by a jury. *See, e.g., Dick Broad.*, 395 S.W.3d at 659 ("The meaning of the contract becomes a question of fact only if an ambiguity remains after we have applied the appropriate rules of construction.") (citing *Planters Gin Co.*, 78 S.W.3d at 890)); *Petty*, 277 S.W.2d at 361 ("[I]t is a well recognized principle that the ascertainment of [the contracting parties'] intention is a question of law or a judicial function for us to perform when the language is plain, simple and unambiguous.").

Tennessee courts' increased emphasis on textual principles represents a clear rejection of the extreme contextual approach referenced in the California case of *Pacific Gas*. Under the *Pacific Gas* approach, if extrinsic evidence shows that the contractual language does not comport with the parties' "actual" intent, the court may override the written words if doing so is necessary to "correct" the written agreement. *See* Gilson et al., 100 Cornell L. Rev. at 36. While a couple of Tennessee cases appear to use this extreme approach,[20] most have forcefully rejected it. *See, e.g., Empress Health & Beauty Spa, Inc.*, 503 S.W.2d at 190 (quoting 17 Am. Jur. 2d, *Contracts* § 245) ("'It is not within the function of the judiciary to look outside of the contract . . . to get at the intention of the parties and then carry out that intention regardless of whether the instrument contains language sufficient to express it; . . . the language of the instrument. . . must be sufficient, when looked at in the light of such facts as the court is entitled to consider, to sustain whatever effect is given to the instrument.'"). Tennessee cases have stressed that courts cannot form a new contract for parties under the guise of interpretation, noting that a contract "may contain terms which may be thought harsh and unjust. A court is not at liberty to make a new contract for parties who have spoken for themselves." *Smithart v. John Hancock Mut. Life Ins. Co.*, 71 S.W.2d 1059, 1063 (Tenn. 1934); *see also Petty*, 277 S.W.2d at 359 (quoting *Smithart*) (quoting *Smithart*).

Tennessee cases have also eschewed an extreme textual approach. Instead, they reflect balance; they demonstrate a definite focus on the written words in the parties' contract, but they also consider evidence related to the situation of the parties and the circumstances of the transaction in interpreting those words. For example, in *Penske*

---

[20] *See, e.g., City of Bristol v. Bostwick*, 202 S.W. 61, 63 (Tenn. 1918) ("[I]t is the duty of the court primarily to construe every contract to effectuate the intention of those contracting. This will be done even though it be necessary to ignore certain apparently inconsistent language contained in the instrument."); *see also Engert v. Peerless Ins. Co.*, 382 S.W.2d 541, 547 (Tenn. Ct. App. 1964) (quoting *City of Bristol*, 202 S.W. at 63). *See generally* Feldman, 21 Tenn. Practice § 8:17.

*Truck Leasing Co. v. Huddleston*, the Court said: "The intention of the parties is to be determined by a fair construction of the terms and provisions of the contract, by the subject matter to which it has reference, by the circumstances of the particular transaction giving rise to the question, and by the construction placed on the agreement by the parties in carrying out its terms." 795 S.W.2d 669, 671 (Tenn. 1990). Following *Penske*, the Court in *Hughes v. New Life Development Corp.* stated, "The search for the parties' intent should focus on the four corners of the contract, the circumstances in which the contract was made, and the parties' actions in carrying out the contract." 387 S.W.3d 453, 465 (Tenn. 2012) (citations omitted). This Court has similarly held that discerning the contracting parties' intentions includes taking into consideration their situation, their motivations, their respective interests, and other contextual circumstances. *See, e.g.*, *City of Columbia v. C.F.W. Constr. Co.*, 557 S.W.2d 734, 739 (Tenn. 1977) ("The evidence of intent is to be found in the language used by the parties . . . considered in the light of their respective interests and other relevant circumstances . . . and in the practical construction given to it by the parties . . . ."); *Kroger Co. v. Chem. Secs. Co.*, 526 S.W.2d 468, 471 (Tenn. 1975) ("While this lease contract cannot be varied by oral evidence 'the course of previous dealings, the circumstances in which the contract was made, and the situation of the parties as aids in determining the meaning of the contract—are matters proper to be looked to by the court in arriving at the intention of the parties to the contract.'" (quoting *Jeffers v. Hawn*, 212 S.W.2d 368, 370 (Tenn. 1948)); *Ashley v. Volz*, 404 S.W.2d 239, 242 (Tenn. 1966) (holding that the parties' "intention may be ascertained by looking to the situation of the parties; the motives which induced the agreement; and the objects and purposes designed to be effected thereby"); *Petty*, 277 S.W.2d at 360 ("In getting at [the parties'] intention we of course do not determine what the state of the mind was of the parties at the time the contract was executed but rather what their intention was as actually embodied and expressed in the instrument as written."); *Stevenson v. Lima Locomotive Works*, 172 S.W.2d 812, 814 (Tenn. 1943) ("The intention of the parties . . . must be found in the contract itself, as well as the situation of the parties . . . and use of the subject matter of the contract.").

In *Hamblen County v. City of Morristown*, this Court considered extrinsic evidence in the form of the parties' post-contract behavior, i.e., the rule of practical construction.[21] 656 S.W.2d 331, 333-35 (Tenn. 1983). The Court used language that

---

[21] The rule of practical construction, "long recognized and applied in this jurisdiction, is that the interpretation placed upon a contract by the parties thereto, as shown by their acts, will be adopted by the court and that to this end not only the acts but the declarations of the parties may be considered." *Hamblen Cnty.*, 656 S.W.2d at 335.

- 24 -

approved consideration of extrinsic evidence of context, even for interpretation of a contract that seemed facially unambiguous, with the important qualification that such evidence cannot be used to modify, expand, or restrict the contract:[22]

> The court in interpreting words or other acts of the parties puts itself in the position which they occupied at the time the contract was made. In applying the appropriate standard of interpretation even to an agreement that on its face is free from ambiguity it is permissible to consider the situation of the parties and the accompanying circumstances at the time it was entered into—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning to be given to the agreement.

*Hamblen Cnty.*, 656 S.W.2d at 334 (quoting Restatement of Contracts § 235(d) and comment); *see also Burress v. Sanders*, 31 S.W.3d 259, 265 (Tenn. Ct. App. 2000) (quoting Bryan A. Garner, *The Elements of Legal Style* 7 (1991)) (noting that "everything [in contract interpretation] hangs on context and purpose").

Some of the cases with the strongest language on contextual principles also use textual principles as well, and vice-versa. In *Hughes*, the Court used language approving the use of evidence on "the circumstances in which the contract was made, and the parties' actions in carrying out the contract," 387 S.W.3d at 465 (citations omitted), but then used the extrinsic evidence primarily to "buttress" the interpretation of the text of the contract, *id*. at 466. In *Petty v. Sloan*, often cited for its strong language in support of the textual approach, the Court went on to describe extrinsic evidence in the record and explicitly consider it: "In reading and studying this contract we of course must construe it with reference to the situation of the parties, the business to which the contract relates and the subject matter as appears from the words used." 277 S.W.2d at 359; *see also Richland Country Club, Inc. v. CRC Equities, Inc.*, 832 S.W.2d 554, 557 (Tenn. Ct. App. 1991).

Looking at the broad range of Tennessee contracts cases, it is clear that Tennessee courts have sought, albeit imperfectly, to achieve balance in contract interpretation. The

---

[22] One commentator describes *Hamblen County* as "the best approach to [Tennessee's] conflicting case law on extrinsic evidence." *See* Feldman, 21 Tenn. Practice § 8:18.

central principle endures, to interpret contracts so as to ascertain and give effect to the intent of the contracting parties. *See, e.g., Wallis*, 509 S.W.3d at 899; *Dick Broadcasting,* 395 S.W.3d at 659; *Clark,* 368 S.W.3d at 441; *Allmand,* 292 S.W.3d at 630. In effectuating this principle, our courts have noted that judges "are entitled to place themselves in the same situation as the parties who made the contract, so as to view the circumstances as they viewed them, and so as to judge of the meaning of the words and of the correct application of the language to the things described." *Staub,* 101 S.W. at 785 (quoting *Nash,* 72 U.S. at 689); *see also Ashley v. Volz,* 404 S.W.2d 239, 242 (Tenn. 1966). Courts should not be "shut out from the same light which the parties enjoyed when the contract was executed." *Staub,* 101 S.W. at 785; *see also Hughes,* 387 S.W.3d at 465; *City of Columbia,* 557 S.W.2d at 739; *Kroger Co.,* 526 S.W.2d at 471; *Ashley,* 404 S.W.2d at 242; *Jeffers,* 212 S.W.2d at 370; *Stevenson,* 172 S.W.2d at 814; *Holcomb,* 277 S.W.3d at 396.

However, the strong strain of textualism in Tennessee caselaw demonstrates resolve to keep the written words as the lodestar of contract interpretation. *See, e.g.,* *Planters Gin Co.,* 78 S.W.3d at 889-90; *Guiliano,* 995 S.W.2d at 95; *Bob Pearsall Motors, Inc.,* 521 S.W.2d at 580; *Empress Health & Beauty Spa, Inc.,* 503 S.W.2d at 190; *City of Cookeville ex rel. Cookeville Reg'l Med. Ctr.,* 126 S.W.3d at 903. Tennessee has rejected firmly any notion that courts are a fallback mechanism for parties to use to "make a new contract" if their written contract purportedly fails to serve their "true" intentions. *See Petty,* 277 S.W.2d at 359; *Smithart,* 71 S.W.2d at 1063. Tennessee courts "give primacy to the contract terms, because the words are the most reliable indicator— and the best evidence—of the parties' agreement when relations were harmonious, and where the parties were not jockeying for advantage in a contract dispute." Feldman, 21 Tenn. Practice § 8:14.

In short, Tennessee cases cite both textualist and contextualist principles; consideration of context evidence does not eclipse other canons of contract interpretation but rather cooperates with them. Thus, as in other states, Tennessee's jurisprudence on contract interpretation "evades tidy classification as textualist or contextualist." Cunningham, 85 Geo. Wash. L. Rev. at 1627.

Important to this appeal, however, despite the sometimes uneven quality of Tennessee contracts jurisprudence on textualist versus contextualist principles, consistent enforcement of an important textual principle—the parol evidence rule—represents a straight line through Tennessee contract caselaw. We discuss this below.

- 26 -

In general, the parol evidence rule provides that "a writing intended by the parties to be a final embodiment of their agreement cannot be modified by evidence of earlier or contemporaneous agreements that might add to, vary, or contradict the writing." Black's Law Dictionary 1292 (10th ed. 2014). "The general rule is that parol evidence is not admissible to contradict a written agreement . . . ."[23] *Hines v. Wilcox*, 33 S.W. 914, 914-15 (Tenn. 1896) (citations omitted); *see also Clayton v. Haury*, 452 S.W.2d 865, 867 (Tenn. 1970); *Somerville v. Gullett Gin Co.*, 194 S.W. 576, 578 (Tenn. 1917); *Johnson v. Cont'l Ins. Co. of N.Y.*, 107 S.W. 688, 689-90 (Tenn. 1907); *Price v. Allen*, 28 Tenn. 703, 711 (1849).

Early Tennessee cases, even those that include language favoring the use of context evidence for interpretation, consistently held the line, forbidding the use of such evidence in a way that would violate the parol evidence rule. In *Staub*, for example, the Court stressed the importance of contextual evidence of the circumstances when the contract was executed, but also cautioned: "The object and effect of such evidence are *not to contradict or vary the terms of the instrument*, but to enable the court to arrive at the proper conclusion as to its meaning, and the understanding and intention of the parties." *Staub*, 101 S.W. at 785 (emphasis added); *see also Deaver v. J. C. Mahan Motor Co.*, 43 S.W.2d 199, 200 (Tenn. 1931); *Somerville*, 194 S.W. at 578; *Johnson*, 107 S.W. at 689-90. Later cases favoring the use of context evidence do the same. *See, e.g., Hamblen Cnty.*, 656 S.W.2d at 334 (permitting extrinsic evidence only to aid in interpretation and "not for the purpose of modifying or enlarging or curtailing its terms").

In *McGannon v. Farrell*, this Court disallowed the use of extrinsic evidence "to ingraft upon the defendant's title a restriction or incumbrance, which is not only not expressed in the deed, but is repugnant to its terms." *McGannon v. Farrell*, 214 S.W. 432, 433 (Tenn. 1919). The Court emphasized the important policy reasons for the parol evidence rule:

> A strict enforcement of [the parol evidence] rule tends to greater security and safety in business transactions, and leaves less opportunity for dishonesty and false swearing, induced, perhaps, by a change of purpose or

---

[23] There are several exceptions to the parol evidence rule. Feldman, 21 Tenn. Practice § 8:52. We need not examine those exceptions under the facts of this case.

a failure to obtain the result that was anticipated when the transaction was originally consummated and reduced to writing.

*Id*. at 434 (quoting *Adams v. Gillig*, 92 N.E. 670, 671 (N.Y. Ct. App. 1910)). Later Tennessee cases likewise explain that the parol evidence rule seeks to prevent fraud by assuming that "the parties deliberately chose to put their agreement in writing to avoid the uncertainties of oral evidence, including the possibility of false testimony as to oral conversations." *Farmers & Merchs. Bank v. Petty*, 664 S.W.2d 77, 82 (Tenn. Ct. App. 1983).

The parol evidence rule is unfortunately named in several respects. First, it encompasses more than simply parol (i.e., oral) evidence of pre-contract negotiations.[24] Second, even though it is sometimes expressed as a rule of evidence relating to the "admissibility" of parol evidence, the parol evidence rule is more accurately characterized as a rule of substantive law. *See Deaver*, 43 S.W.2d at 200 (citing Wigmore on Evidence, § 2400); *GRW Enters., Inc. v. Davis*, 797 S.W.2d 606, 610 (Tenn. Ct. App. 1990) ("The parol evidence rule is a rule of substantive law intended to protect the integrity of written contracts."). This means that even evidence of pre-contract negotiations that is admitted without objection is "incompetent and ineffective" to alter the terms of a written agreement. *Deaver*, 43 S.W.2d at 200. "The question is not really whether evidence can be admitted which might vary the written document, but whether, if the evidence is admitted, it will have the legal effect of varying the document." P.S. Atiyah, *An Introduction to the Law of Contract* 161-62 (3d ed. 1981) (quoted at Black's Law Dictionary 1292 (10th ed. 2014)).

By the same token, evidence of pre-contract negotiations that *does not* contradict the written contract *is not* prohibited by the parol evidence rule. *See, e.g.*, *Hines*, 33 S.W. at 915 ("[T]his rule does not apply in cases where the parol evidence in no way contradicts or alters the terms of the written contract, but tends to establish an independent or collateral agreement not in conflict with it."); *see also Hamblen Cnty.*, 656 S.W.2d at 334 (noting that evidence on parties' situation when the contract was entered into may not be used to modify or vary its terms but can be used "to aid in

---

[24] Although the term "parol" means "oral," the "parol evidence rule" is generally understood to apply to both oral and written extrinsic evidence of pre-contract negotiations between the parties. *See* Feldman, 21 Tenn. Practice § 8:41; *see also* David G. Epstein et al., *Extrinsic Evidence, Parol Evidence, & the Parol Evidence Rule: A Call for Courts to Use the Reasoning of the Restatements Rather than the Rhetoric of Common Law*, 44 N. M. L. Rev. 49, 53-54 (2014) (discussing definitions of "parol").

determining the meaning to be given to the agreement."). Put simply, "[t]he ultimate test is that of contradiction, which is never permissible." *Deaver*, 43 S.W.2d at 200; *Clayton*, 452 S.W.2d at 867.

Noteworthy under the facts of this case, the parol evidence rule is most restrictive when the contract at issue is fully or completely integrated—that is, when it is intended to be the complete and exclusive statement of the parties' agreement.[25] *Schaeffer v. Am. Honda Motor Co.*, 976 F. Supp. 736, 741 (W.D. Tenn. 1997) (quoting Restatement (Second) of Contracts §§ 209-210 (1981)) ("An integrated agreement is a writing constituting a final expression of one or more terms of an agreement; a completely integrated agreement has been 'adopted by the parties as a complete and exclusive statement of the terms of the agreement.'"). When a contract is fully integrated, the parol evidence rule does more than prohibit the use of pre-contract negotiations to contradict the contract's terms; it also prohibits the use of pre-contract negotiations within *the scope of* the agreement in a way that would *supplement or limit* its terms, even if that evidence is consistent with the written terms of the contract. *See id.*; *see also Anderson v. St. Louis Terminal Warehouse Co.*, 173 F.2d 436, 438 (6th Cir. 1949); *Strickland v. City of Lawrenceburg*, 611 S.W.2d 832, 838 (Tenn. Ct. App. 1980) (citing *Bunge Corp. v. Miller*, 381 F. Supp. 176, 178 (W.D. Tenn. 1974)). In other words, "[w]hen a contract is partially integrated, it may not be contradicted by parol evidence, but may be supplemented by consistent, additional terms;" however, when a contract is fully integrated, "it also may not be . . . supplemented by additional terms, whether consistent or inconsistent."[26] Feldman, 21 Tenn. Practice § 8:50 (emphasis added); *see* Restatement (Second) of Contracts § 213 & cmt. c ("Where the parties have adopted a writing as a complete and exclusive statement of the terms of the agreement, even consistent additional terms are superseded.").

---

[25] This common-law rule is statutorily embodied in the Uniform Commercial Code, which governs cases involving the sale of goods. *See* Tenn. Code Ann. § 47-2-202 (Supp. 2017) (providing that terms in written agreements may not be contradicted by extrinsic evidence but may be explained or supplemented "[b]y evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement"); *see also Harry J. Whelchel Co. v. Ripley Tractor Co.*, 900 S.W.2d 691, 692-93 (Tenn. Ct. App. 1995).

[26] If a contract does not contain an integration clause, the appropriate application of the parol evidence rule depends on the preliminary factual question of whether the contract at issue was a final integration of the parties' entire agreement. *See* Feldman, 21 Tenn. Practice § 8:48; *see also* Restatement (Second) Contracts § 210(3).

The contracts at issue in the instant case contained an integration clause, which indicates the parties' intent that the contracts embody their complete and exclusive agreement.[27]  IHS does not dispute the fact that the parties' agreements are fully integrated.  Consequently, the parol evidence rule is applicable.  *See* 11 Williston on Contracts § 33:23 (4th ed. May 2018 Update) ("By stipulating the fact of integration, these clauses purport by the very terms of the parties' agreement to require application of the parol evidence rule."); 3 Corbin on Contracts § 573 ("When two parties have made a contract and have expressed it in a writing to which they have both assented as the complete and accurate integration of that contract, evidence, whether parol or otherwise, of antecedent understandings and negotiations will not be admitted for the purpose of varying or contradicting the writing."); Restatement (Second) of Contracts § 213 & cmt. a (1981) (commenting that this section describes "what is commonly known as the parol evidence rule").

When the parties' contracts are fully integrated, general extrinsic evidence of context may be used to interpret the contractual language in line with the parties' intent, but the parol evidence rule prohibits the use of evidence of pre-contract negotiations in order to vary, contradict, or supplement the contractual terms of a fully integrated agreement.  As explained by the Texas Supreme Court:

> The parol evidence rule does not. . . prohibit courts from considering extrinsic evidence of the facts and circumstances surrounding the contract's execution as an aid in the construction of the contract's language, but the evidence may only give the words of a contract a meaning consistent with that to which they are reasonably susceptible, i.e., to interpret contractual terms.  This is true even if doing so reveals a latent ambiguity in a

---

[27] The integration clause in the 2009 Agency Agreement is entitled "Article X—Entire Contract." Like a typical integration clause (also known as a "merger clause"), this provision states specifically that the contract constitutes the final and entire agreement between the parties and that "[a]ny prior agreements, promises, negotiations[,] or representations, either verbal or written, relating to the subject matter of this Agreement and not expressly set forth in this Agreement are of no force or effect." *See* Ralph James Mooney, *A Friendly Letter to the Oregon Supreme Court: Let's Try Again on the Parol Evidence Rule*, 84 Or. L. Rev. 369, 371-72 (2005).  The integration clause, also known as a "merger" clause, is so called because it expresses the parties' intent that all of their oral or written "agreements, promises, negotiations[,] or representations" related to the subject matter of the agreement are deemed "integrated" or "merged" into this one writing, which represents the parties' "entire contract."  Uri Benoliel, *The Interpretation of Commercial Contracts: An Empirical Study*, 69 Ala. L. Rev. 469, 481 & n.75 (2017) ("A merger clause, known also as an 'integration' or 'entire agreement' clause, merges all pre-contractual negotiations between the parties into the written contract." (Footnote omitted)).

- 30 -

contract's terms. But whether a court is considering if an ambiguity exists or construing the terms of an unambiguous contract, *surrounding facts and circumstances can only provide context that elucidates the meaning of the words employed, and nothing else.* As we have often stated in one way or another, understanding the context in which an agreement was made is essential in determining the parties' intent as expressed in the agreement, but it is the parties' expressed intent that the court must determine.

*URI, Inc. v. Kleberg Cnty.*, 543 S.W.3d 755, 765 (Tex. 2018) (footnotes, quotation marks, and alterations omitted, emphasis added). Thus, while "courts should permit extrinsic evidence to give context to the language," they should not utilize extrinsic evidence in a way that "negates the parol evidence rule. . . . [T]o allow extrinsic evidence to change the terms of the agreement would cast a long shadow of uncertainty over all transactions and contracts." Feldman, 21 Tenn. Practice § 8:18.

Thus, in interpreting a fully integrated contract, extrinsic evidence may be used to put the written terms of the contract into context, but it may not be used to vary, contradict, or supplement the contractual terms in violation of the parol evidence rule. We now apply the above principles to our analysis of the parties' arguments in this appeal.

*Application*

A. Changes in Renewal Rates on Existing Policies

We first address BlueCross's argument that the lower courts erred in concluding that it breached the 2009 Agency Agreement because the agreement did not permit BlueCross to unilaterally reduce commission rates on renewals of existing insurance policies in the May 2011 Schedule.

To recap, when the trial court denied IHS's motion for partial summary judgment, it found that the language in the parties' agreements unambiguously authorized BlueCross to reduce the renewal commission rates on existing policies. Later, when the trial court denied BlueCross's motion for partial summary judgment on this issue, it held that the extrinsic evidence submitted by IHS created a genuine issue of material fact on the meaning of the disputed contractual language. At trial, over BlueCross's objections, the trial court allowed the testimony of former BlueCross and IHS representatives regarding the parties' mutual intent that the renewal rates "vested" at the time the policies

were sold and were not subject to modification by BlueCross.[28]  The trial court ultimately relied on that evidence to hold that the contract was ambiguous, find that the parties mutually intended for the renewal rates in effect at the time each policy was sold to be a "vested" right not subject to modification by BlueCross, and construed the contract in accordance with that mutual intent.  The trial court explained that this interpretation was supported by the rule of practical construction, i.e., the post-contractual behavior of the parties.  The appellate court affirmed the trial court's interpretation of these provisions, based on the rule of practical construction and the conduct of the parties during the course of the contractual relationship.

In this appeal, BlueCross argues that the trial court erred in admitting evidence of the parties' pre-contract negotiations after initially concluding that the contractual language was unambiguous.  IHS, on the other hand, argues that the trial court rightly admitted the testimony of BlueCross and IHS representatives to put the parties' agreement into context and demonstrate their mutual intent when the contracts were executed.  It maintains that the trial court correctly interpreted the contract to align with the parties' mutual intent.

We agree with BlueCross that the testimony on which IHS relies includes the type of evidence that implicates the parol evidence rule.  Some of the testimony submitted into evidence by IHS relates to oral pre-contract negotiations on the subject matter of the written agreements, so we must consider how the parol evidence rule applies to the issues at bar.

Under the facts of this case, our focus is less on the admissibility of the testimony and more on its ultimate use.  This is for two reasons.  First, the evidence to which Blue Cross objects included testimony about context, i.e., the situation of the parties and the circumstances and motivations behind the agreements.  This part of the evidence was potentially relevant for an acceptable purpose.  "The parol evidence rule does not . . . prohibit courts from considering extrinsic evidence of the facts and circumstances surrounding the contract's execution as an aid in the construction of the contract's language."  *URI*, 543 S.W.3d at 765.

---

[28] The lengthy testimony on which IHS relies included testimony from both BlueCross and IHS representatives who were involved in negotiating the Agency Agreements.  The testimony fully supported a finding that it was the mutual intent of the contracting parties that modified renewal rates would apply only to new policies.  The trial court credited this testimony, and we give appropriate deference to the trial court's credibility determinations.  *Wells v. Tenn. Bd. of Regents*, 9 S.W.3d 779, 783 (Tenn. 1999).

Second, as noted above, the parol evidence rule is not actually an evidentiary rule; it is more accurately characterized as a rule of substantive law. *See Deaver*, 43 S.W.2d at 200 (citing Wigmore on Evidence, § 2400); *GRW Enters., Inc.*, 797 S.W.2d at 610. So for that reason as well, our analysis centers less on the admissibility of the testimony and more on whether its ultimate use by the lower courts, the legal effect of the evidence, contravened the parol evidence rule.

The commissions due to IHS were governed by the commission schedules, which were attached to and incorporated into the Agency Agreements. Both the initial commission schedules and all subsequent commission schedules set forth the applicable commission rates along with other "terms and conditions." One of the "terms and conditions" listed in the commission schedules addresses the specific topic at issue here—the application of the new commission rates to existing policies. Each schedule issued (except the May 2011 Schedule) contained a provision we refer to as the "renewal-rate provision": "This Commission Schedule supplements any previous Commission Schedule you may have received; commissions for products previously sold are governed by the Commission Schedule in place at the time the sale was made." In addition, at the bottom of each modified commission schedule, there was a bolded provision we refer to as the "modification provision": "[BlueCross] reserves the right to modify or change the commission and payment schedules with appropriate notification."

The testimony on the parties' alleged mutual intent to prohibit BlueCross from removing the renewal-rate provision from the May 2011 Schedule certainly falls the scope of the parties' overall written agreements. As we have explained, when a contract is fully integrated, as these contracts are, the parol evidence rule prohibits the use of pre-contract negotiations within the scope of the agreement in a way that would supplement, limit, or contradict the contractual terms. *Schaeffer*, 976 F. Supp. at 741 (quoting Restatement (Second) of Contracts §§ 209-210 (1981)); *see also Anderson*, 173 F.2d at 438; *Strickland*, 611 S.W.2d at 838. Here, the testimony on the parties' pre-contract negotiations and mutual intent directly contradicts the modification provision. The modification provision could not be more all-encompassing. It "reserves" to BlueCross the right to unilaterally "modify or change the commission and payment schedules." The "terms and conditions" are simply provisions in the commission schedules, so it follows logically that the modification provision gives BlueCross the right to "change or modify" them unilaterally with sufficient notice to IHS.

Under IHS's alternate interpretation, the agreements should be construed in a way that aligns with the parties' mutual intent to *limit* BlueCross's authority to modify or change renewal commission rates. This interpretation, however, directly contradicts the

- 33 -

*carte blanche* authority granted to Blue Cross by the modification provision. Because the testimony on the parties' mutual intent relates to a subject matter within the scope of the parties' agreement, relying on that evidence in order to directly contradict the plain terms of the agreement contravenes the parol evidence rule. Under the parol evidence rule, the evidence was ineffective to alter, vary, or supplement the clear written terms of the contract.

The intermediate appellate court below identified the fallacy in the trial court's use of what the parties "thought or believed" in interpreting the agreements. It nevertheless affirmed the trial court's interpretation based on the rule of practical construction, i.e., the post-contract conduct of the parties. *IHS*, 2017 WL 2105988, at *9 (citing *Hamblen Cnty.*, 656 S.W.2d at 335) (reasoning that the parties' conduct for the first eleven years showed that, when they entered into the contract, they intended for commission rates to be "vested" for existing policies and for all modifications to apply prospectively).

We do not disagree that the post-contract conduct of the parties can, in some circumstances, elucidate the parties' own interpretation of their agreement. *See Hamblen Cnty.*, 656 S.W.2d at 335; *Ballard v. N. Am. Life & Cas. Co.*, 667 S.W.2d 79, 84 (Tenn. Ct. App. 1983). In this case, however, the parties' post-contract conduct does not demonstrate a mutual understanding that BlueCross was precluded from changing or modifying the renewal-rate provision. Rather, the parties conducted themselves in accordance with each subsequent commission schedule, which BlueCross was authorized to modify in its sole discretion. The fact that BlueCross included the renewal-rate provision in all pre-May 2011 commission schedules does not establish that it was required to do so in the May 2011 Schedule. It means only that the situation that led to this dispute had not yet arisen. Sometimes evidence of context "may well reveal that the terms of the contract are not, and never were, clear on their face. On the other hand, that context may well reveal that contract terms are, and have consistently been, unambiguous." *Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir. 1999).[29] Therefore, we reject the lower courts' reliance on the rule of practical construction in affirming the trial court's decision on the renewal-rate issue.

This interpretation of the modification provision may be harsh in that it gives Blue Cross very broad authority to modify the terms of the commission schedules. However, as we have noted, Tennessee cases have stressed that courts cannot make a new contract for parties under the guise of interpretation, even where a contract contains terms that appear harsh or unjust. "A court is not at liberty to make a new contract for parties who

---

[29] *See* Feldman, 21 Tenn. Practice § 8:18 (quoting *Metric Constructors, Inc.*, 169 F.3d at 752.

- 34 -

have spoken for themselves." *Smithart*, 71 S.W.2d at 1063; *see also Petty*, 277 S.W.2d at 359 (quoting *Smithart*).

Our conclusion on this issue is consistent with cases from other jurisdictions addressing similar provisions.[30] *See, e.g.*, *CoMa Ins. Agency, Inc. v. Safeco Ins. Co.*, 526 Fed. Appx. 465, 468-69 (6th Cir. 2013) (allowing insurance company to unilaterally modify renewal rates for existing policies); *Wesolowski v. Am. Family Mut. Ins. Co.*, No. 99-2522, 2000 WL 1195655, at *5 (Wis. Ct. App. 2000) (noting application of new renewal rates to existing policies is not actually a "retroactive" change but a prospective change to existing policies); *FHK Corp. v. BlueCross & BlueShield United of Wis.*, No. 90-2746, 1991 WL 236486, at *3 (Wis. Ct. App. Sept. 24, 1991) ("Although [the agency] might think it unfair for BlueCross to unilaterally change commissions on renewals, the 1973 contract specifically gave BlueCross that right."); *see also* 4 Couch on Insurance § 57:22 (citing *Donovan v. Bankers Fidelity Life Ins. Co.*, 26 F.3d 854 (8th Cir. 1994)) (stating that, in a contract between an agent and an insurance company, a provision allowing the insurance company to unilaterally change commission rates "has been given effect even as to policies sold before the date of the notice of the change")).

For these reasons, we hold that the trial court violated the parol evidence rule by using evidence of the parties' pre-contract mutual intent to contradict the text of the parties' agreement. Under the plain language of the modification provision, BlueCross had the right to unilaterally change or modify the entire commission schedule, including the renewal-rate provision. Therefore, we reverse the lower court decisions and conclude that BlueCross did not breach the 2009 Agency Agreement by changing the renewal-rate provision and making its May 2011 renewal rates applicable to existing insurance policies.

### B. Post-termination Payments Directly to Subagents

BlueCross next argues that the lower courts erred in holding that it breached the 2009 Agency Agreement by refusing to pay post-termination commissions to IHS and instead paying those commissions directly to the subagents associated with the policies.

---

[30] IHS distinguishes the cases from other jurisdictions based on the fact that the contracts being interpreted did not include a "vesting" provision, referring to the applicable renewal-rate provision. As we have noted, however, this so-called "vesting" provision was not guaranteed by the parties' Agency Agreements; rather, it was a term included in the commission schedules, which were entirely modifiable by BlueCross. Therefore, the reasoning in these cases is consistent with our reasoning in the instant case.

- 35 -

To briefly review, the trial court initially held that the unambiguous language of the parties' agreements plainly allowed BlueCross to make post-termination commission payments directly to the producing agents. Later, the trial court denied BlueCross's motion for partial summary judgment on this issue.

At trial, the court allowed IHS to introduce testimony of the parties' pre-contract negotiations on this issue as well. BlueCross and IHS representatives testified that the parties bargained for IHS to take on administrative functions regarding the subagents in exchange for BlueCross's agreement to pay commissions directly to IHS. According to the testimony, in order to offset its administrative costs, IHS retained a portion of the commissions before paying the subagents.

After the trial, the trial court held that BlueCross breached the contract by making post-contract commission payments directly to IHS's producing agents. Viewing the contractual language in context, the trial court held that BlueCross was not entitled to make post-termination commission payments directly to the subagents because IHS was "still conducting business and, therefore, [was] 'able' and 'available' [to receive the payments]" under the agreement. The Court of Appeals affirmed.

BlueCross argues first that the trial court erred in admitting extrinsic evidence regarding the parties' negotiations on this contractual provision. It points out that, once again, the trial court initially viewed the contract language as plain and unambiguous in favor of BlueCross's interpretation, but it nevertheless admitted extrinsic evidence from IHS and then used that evidence to construe the contractual language in favor of IHS. IHS responds that the testimony was properly considered because it does not alter or vary the terms of terms of the contract.

Given that the parol evidence rule is most accurately characterized as a rule of substantive law, we focus on whether the trial court's *use* of the evidence on the parties' pre-contract negotiations ran afoul of the parol evidence rule.

Two provisions in the 2009 Agency Agreement are applicable to this issue. The first is a provision titled "Article XII—Compensation" ("Compensation Provision"). The Compensation Provision states that "[a]ll compensation due to [IHS] or [the subagents] will be paid directly [by BlueCross] to [IHS]" and that "[IHS] is solely responsible for any compensation owed to [subagents]." That same paragraph provides that, "in the event [IHS] is no longer *able, entitled or available* to receive Commissions, [BlueCross] shall use its best efforts to contract individually with the [subagents] pursuant to an

Individual Products Agency Agreement in use by [BlueCross] at that time." (Emphasis added).

The other relevant provision is titled "Article XIV—Termination" ("Termination Provision"). According to the Termination Provision, once the contract has been terminated without cause, neither the parties nor the subagents "shall have any claim against the other for any alleged loss of prospective profits or commissions," except "that renewal commissions for policies with effective dates prior to termination *will continue to be paid by [BlueCross]*." (Emphasis added). Stated in the active voice, even after termination of the agreement, BlueCross remains obligated to continue paying renewal commissions.

IHS argues that, when the Compensation Provision and the Termination Provision are read together, they require BlueCross to continue paying post-termination commissions to IHS and to prohibit BlueCross from making those payments directly to the subagents unless IHS "is no longer able, entitled or available" to receive commissions. Because the testimony of the parties' mutual intent is consistent with this language, IHS insists, it was admissible and was probative of the parties' intent.

In response, BlueCross concedes that IHS was "able" and "available" to receive commissions after the contract was terminated. However, it claims that, once the contract was terminated, IHS was no longer "entitled" to be paid commissions because "[t]he Agreement is the only grounds on which IHS can claim a right to commission payments from [BlueCross]. After [BlueCross] exercised its right to terminate the Agreement, [BlueCross's] relationship with IHS as a general agent ended, and IHS retained no right to receive commission payments on policies sold by other producing agents." Therefore, BlueCross argues, after termination of the agreement, IHS was no longer "entitled" to any commissions, so evidence that the parties mutually intended otherwise is contrary to the contractual language and should have been excluded under the parol evidence rule.

We agree with IHS and the lower courts on this issue. The *Compensation* Provision provides that all commissions must be paid directly to IHS unless IHS "is no longer able, entitled or available" to receive commissions. IHS's "entitlement" comes from the *Termination* Provision, which requires BlueCross to "continue to" pay renewal commissions after the contract is terminated. By requiring BlueCross to "continue to" pay renewal commissions, the Termination Provision clearly contemplates "continuation" of the same practice of paying commissions to IHS. While the testimony regarding the parties' mutual intent fell within the scope of the agreement, it did not purport to vary, supplement, or limit the contractual language. Rather, the extrinsic evidence illuminates

- 37 -

the parties' intent and is consistent with the plain language of the contract. *See Hines*, 33 S.W. at 915 (parol evidence rule "does not apply in cases where the parol evidence in no way contradicts or alters the terms of the written contract. . . ."); *Hamblen Cnty.*, 656 S.W.2d at 334 ("In applying the appropriate standard of interpretation even to an agreement that on its face is free from ambiguity it is permissible to consider the situation of the parties and the accompanying circumstances at the time it was entered into—not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning to be given to the agreement."). Consequently, the trial court's use of extrinsic evidence on this issue did not violate the parol evidence rule.

Thus, BlueCross's claim that IHS is not "entitled" to receive commissions after termination of the contract ignores its specific post-termination obligation to "continue to" pay "renewal commissions for policies with effective dates prior to termination." Accordingly, we affirm the decisions of the lower courts on this issue and conclude that BlueCross breached the 2009 Agency Agreement by refusing to pay post-termination commissions to IHS and instead paying post-termination commissions directly to the producing agents. *See IHS*, 2017 WL 2105988, at *10.

C. Indemnity Provision/Attorney Fees

IHS argues next that it was entitled to an award of attorney fees under the indemnity provision in the parties' contract.

To review, the trial court first denied IHS's claim for attorney fees, but it later reversed its position based on trial testimony that the parties specifically bargained for a fee-shifting provision. The Court of Appeals then reversed the trial court's ultimate decision and rejected IHS's claim for attorney fees, holding that the indemnification provision "does not apply to disputes between the contracting parties, BlueCross and IHS." *IHS*, 2017 WL 2105988, at *27.

IHS argues on appeal that the language in the indemnity provision may fairly be construed to allow it to recover attorney fees in this lawsuit and that the evidence of the parties' mutual intent supports this interpretation of the parties' agreement. The testimony submitted by IHS at trial regarding the formation of the contract showed that, when the 1999 Agency Agreement was executed, the parties were "fierce competitors," that BlueCross had overwhelming financial superiority, that BlueCross had a history of anti-competitive behavior, that IHS mistrusted BlueCross, and that IHS was specifically concerned about litigation between it and BlueCross. Based on these circumstances, IHS argues, inter-party indemnity was a "key issue" during the negotiations, perhaps the

"biggest issue" for IHS, to make certain it would be able to recover its attorney fees from BlueCross in the event of litigation. This evidence of the parties' mutual intent, IHS argues, supports the trial court's interpretation of the indemnity provision.

IHS cites several cases from other jurisdictions indicating that "there is nothing in the word 'indemnity' that limits it to third parties." *Caldwell Tanks, Inc. v. Haley & Ward, Inc.*, 471 F.3d 210, 216 (1st Cir. 2006); *see also GFSI Canada Co. v. Fletcher Liesure Grp., Inc.*, 277 P.3d 447 (Kans. Ct. App. 2012). These legal authorities coupled with the extrinsic evidence, IHS claims, shows that the trial court properly held that the indemnity provision applied to inter-party claims.

As with the other issues, BlueCross argues preliminarily that the trial court erred in admitting testimony on the parties' intent that the indemnity provision would cover indemnity of attorney fees in a suit brought by the contracting parties. BlueCross points out that both parties are sophisticated business entities that are presumably cognizant of Tennessee law regarding the requirements for fee-shifting contract provisions. Because the indemnity provision does not specifically provide that the parties are required to indemnify one another for attorney fees on litigation between the contracting parties, BlueCross maintains, the Court of Appeals correctly reversed the trial court's award of attorney fees.[31]

We begin our analysis by looking at the contractual language. The applicable provision in both the 1999 and 2009 Agency Agreements is titled "Article VI— Indemnity," and it provides mutual indemnity provisions:

A. [IHS] and the [subagents] agree to indemnify and hold [BlueCross] . . . harmless from any and all claims, lawsuits, settlements, judgments, costs, interest and penalties, expenses and taxes, including but not limited to attorney's fees and court costs, resulting from, or arising directly or indirectly out of or in connection with, any action or lack of action by [IHS] or any [subagent] associated with this General Agency Agreement and/or [IHS] and [subagents].

B. [BlueCross] agrees to indemnify and hold [IHS] . . . harmless from any and all claims, lawsuits, settlements, judgments, costs, interest[ ] and penalties, expenses and taxes, including but not limited to attorney's fees and court costs, resulting from or arising directly or indirectly out of or in

---

[31] Amicus Curiae Tennessee Chamber of Commerce & Industry supports this argument.

connection[ ] with, any action or lack of action by [BlueCross] associated with this Agreement.

As we have indicated, all contracts must be interpreted in a manner that is consistent with general legal principles. Among them is the well-established legal principle that Tennessee "adheres to the 'American rule' for an award of attorney fees." *Id.* at \*22 (quoting *Cracker Barrel Old Country Store, Inc. v. Epperson*, 284 S.W.3d 303, 308 (Tenn. 2009)). Attorney fees are not ordinarily an element of contract damages. "Under the American rule, 'a party in a civil action may recover attorney fees only if: (1) a contractual or statutory provision creates a right to recover attorney fees; or (2) some other recognized exception to the American rule applies, allowing for recovery of such fees in a particular case.'" *Cracker Barrel*, 284 S.W.3d at 308; *see also Goings v. Aetna Cas. & Sur. Co.*, 491 S.W.2d 847, 848 (Tenn. Ct. App. 1972). In *Cracker Barrel*, this Court held that, "[i]n the context of contract interpretation, Tennessee allows an exception to the American rule only when a contract *specifically or expressly* provides for the recovery of attorney fees." *Cracker Barrel*, 284 S.W.3d at 309 (citing *House v. Estate of Edmondson*, 245 S.W.3d 372, 377 (Tenn. 2008) ("The American rule provides that a party in a civil action may not recover attorney's fees absent a *specific* contractual or statutory provision providing for attorney's fees . . . ." (emphasis added))); *Pullman Standard*, 693 S.W.2d at 338 ("We continue to adhere to the rule in Tennessee that attorneys' fees are not recoverable in the absence of a statute or contract specifically providing for such recovery . . . ."); *Pinney v. Tarpley*, 686 S.W.2d 574, 581 (Tenn. Ct. App. 1984) ("In the absence of an express agreement to pay attorney's fees for enforcement of a contract, such are not recoverable in Tennessee.") (emphasis added)). The takeaway from these authorities is this: "If a contract does not specifically or expressly provide for attorney fees, the recovery of fees is not authorized." *Cracker Barrel*, 284 S.W.3d at 308.

This precept forms the backdrop for our consideration of the indemnity provision in the instant case. The question becomes whether the language in the indemnity provision is sufficiently specific to apply to the recovery of attorney fees in this inter-party lawsuit.[32] We hold that it is not.

The indemnity provision at issue has fairly typical language. Several Tennessee cases have addressed the question of whether an indemnity provision is specific enough to serve as a fee-shifting provision. Most have held that, even if boilerplate indemnity

---

[32] For an in-depth summary of the arguments of the parties and the positions taken by the amici curiae on this topic, see *IHS*, 2017 WL 2105988, at \*18-19.

provisions provide for the recovery of attorney fees in third-party claims, they do not constitute a fee-shifting provision that would allow for the recovery of attorney fees in lawsuits between the contracting parties.

For example, in *Holcomb v. Cagle*, a landlord sued a tenant based on the tenant's failure failing to pay real estate taxes on the leased property, and the landlord prevailed. *Holcomb*, 277 S.W.3d at 397. The landlord then sought an award of attorney fees under an indemnity provision in the parties' lease. The indemnity provision stated that the tenant was to hold the landlord harmless from "any cost, loss, damage or expense arising solely out of any failure of the Tenant to comply with any of the requirements or provisions of th[e] Ground Lease." *Id.* The court declined to award the landlord attorney fees based on the American rule, explaining that "attorneys' fees will not be recoverable in a suit between the parties to a contract to simply enforce the provisions of the contract, unless the language of the contract expressly allows for attorneys' fees to be recoverable." *Id.* at 397-98.

Similarly, in *Eatherly Constr. Co. v. HTI Memorial Hosp.*, a construction company sued a hospital for payment under the parties' contract. No. M2003-02313-COA-R3-CV, 2005 WL 2217078, at *11 (Tenn. Ct. App. Sept. 12, 2005). The contract contained an indemnity provision requiring the construction company to "agree to indemnify, . . . and hold harmless the Owner, . . . from and against all claims, damages, losses, . . . causes of action, . . . and expenses (including attorney's fees) of any . . . description, directly or indirectly arising out of, caused by, or resulting from . . . breach of any of the Contractor's covenants, agreements, obligations or duties under the Contract Documents." *Id.* at *10. The provision further stated that the construction company was required to "promptly advise the Owner . . . of any action . . . as to which this indemnification may apply, and the Contractor, at the Contractor's expense shall assume on behalf of the Owner (and the other Indemnities) and conduct with due diligence and in good faith the defense thereof." *Id.*

The *Eatherly* court held that the indemnity provision did not apply to litigation between the contracting parties because it used the words "indemnification" and "indemnitee," so applying the provision to litigation between the contracting parties would lead to the "absurd result" of requiring the contractor to provide a defense for the hospital in a lawsuit against itself. *Id.* at *10-11. For those reasons, and in light of the American rule, the court declined to award attorney fees to the hospital under the indemnity agreement. *See Colonial Pipeline Co. v. Nashville & E. R.R. Corp.*, 253 S.W.3d 616, 624 (Tenn. Ct. App. 2007) (summarily holding that applying the indemnity

provision in the parties' contract to a suit between the contracting parties "would yield an absurd result").[33]

The only contrary Tennessee case appears to be a decision by our Court of Appeals in *Linden v. Am. Storage Park*, on which the trial court relied in the instant case. 1990 WL 6836, at *1. In *Linden*, the plaintiff sued his self-storage company for gross negligence. *Id*. The parties' lease agreement contained an indemnity provision that required the plaintiff "to indemnify and hold harmless the [storage company] from and against any and all and any manner of claims for damages or loss to property or personal injury and costs including attorney's fees arising from tenant's use of the space or the facility." *Id*. at *5. The court permitted the storage company to recover its attorney fees under this indemnity agreement because "[o]ur Supreme Court has held that costs and attorney fees are recoverable under an indemnity contract when the language of the agreement is broad enough to cover such expenses." *Id*.

The basis of the holding in *Linden* appears questionable. In support of its conclusion, the intermediate appellate court cited *Pullman Standard v. Abex Corp.*, 693 S.W.2d 336 (Tenn. 1985), and *Harpeth Valley Utilities District v. Due*, 465 S.W.2d 353 (Tenn. 1971). *Linden*, 1990 WL 6836, at *5. In both of those cases, the courts allowed the claimant to recover attorney fees under an indemnity agreement when the attorney fees were incurred *in defending suits against third parties*, not in the lawsuit with the other contracting party. *See Pullman Standard*, 693 S.W.2d at 338; *Harpeth Valley*, 465 S.W.2d at 354. Further, although the holding in *Linden* is ostensibly based on the breadth of the indemnity provision, the lease agreement also included a specific "Attorney's Fees and Cost" provision, which required the plaintiff to pay the storage company's attorney fees if it was required to hire an attorney to enforce the lease. *Linden*, 1990 WL 6836, at *2. For these reasons, *Linden* has not proven to be persuasive. *See Bowen v. Paisley*, No. 3:13-CV-0414, 2014 WL 2708499, at *2-3 (M.D. Tenn. June 16, 2014) (following *Colonial Pipeline* and *Holcomb* and rejecting *Linden*); *Nat'l Healthcare Corp. v. Barker*, No. 3:14-cv-02015, 2016 WL 3232725 (M.D. Tenn. June 13, 2016) (following *Colonial Pipeline* and rejecting *Linden*); *see also Pinney v. Tarpley*, 686 S.W.2d 574, 581 (Tenn. Ct. App. 1984) (noting that "[a]ttorney's fees incurred by the indemnitee in efforts to avoid the [third-party] losses are covered by the indemnity agreement," but "[i]n the absence of an express agreement to pay attorney's fees for enforcement of a contract, such are not recoverable in Tennessee").

---

[33] We note that the Court of Appeals in *Colonial Pipeline* concluded that, under the facts of that case, applying the indemnity provision to a suit between the contracting parties would have led to an "absurd result," *Colonial Pipeline Co.*, 253 S.W.3d at 624, an argument not necessarily applicable here.

- 42 -

As argued forcefully by IHS, cases from other jurisdictions have held that indemnity provisions similar to the subject provision in this case were sufficiently broad to cover an award of attorney fees between the contracting parties. In Tennessee, however, if the parties wish to contract in a manner contrary to the American Rule and provide for fee shifting in lawsuits arising out of their contract, the provision must specifically describe a fee-shifting agreement.[34]

In arguing that the trial court's interpretation of the indemnity provision is correct, IHS also relies on extrinsic evidence, i.e., testimony of the parties' mutual intent that the indemnity provision be used as a fee-shifting provision. The trial court held that the witness testimony presented by IHS constituted "clear and weighty testimony . . . that the indemnity provision was intended to permit recovery of attorney's fees in interparty disputes." Assuming *arguendo* that the parties intended to include a fee-shifting provision in the Agreement, we must agree with the Court of Appeals that the written words in the indemnity provision did not accomplish that objective. *See IHS*, 2017 WL 2105988, at *25. BlueCross put it succinctly: "If the parties wanted to impose fee-shifting obligations in litigation between themselves, it was incumbent upon them to adopt a contractual provision clearly and unequivocally doing so." *Id.* This Agreement failed to do so.

Accordingly, we affirm the Court of Appeals' holding that IHS is not entitled to attorney fees under the indemnity provision.

### Discovery Rule and Statute of Limitations

After the bench trial in this case, the trial court held that BlueCross had systemically underpaid commissions throughout its 13-year contractual relationship with IHS. BlueCross contended that the damages for which it was liable should be limited by the six-year statute of limitations applicable to breach-of-contract actions. The trial court rejected that argument. It held that, because BlueCross's underpayments were "inherently undiscoverable," the discovery rule tolled the six-year statute of limitations until the breach should have been discovered. Accordingly, it held BlueCross liable for

---

[34] Other states also require specific fee-shifting language for an indemnity provision to apply to a dispute between the contracting parties. *See, e.g.*, *Nevadacare, Inc. v. Dep't of Human Servs.*, 783 N.W.2d 459, 470-71 (Iowa 2010); *Hooper Assocs., Ltd. v. AGS Computers, Inc.*, 548 N.E.2d 903, 905 (N.Y. 1989); *Laurens Emergency Med. Specialists, P.A. v. M.S. Bailey & Sons Bankers*, 584 S.E.2d 375, 378 (S.C. 2003); *Icehouse Inc. v. Geissler*, 636 N.W.2d 459, 466-67 (S.D. 2001).

underpaid commissions for the entire duration of the parties' contractual relationship. The Court of Appeals affirmed.

On appeal to this Court, BlueCross argues that the lower courts erred in rejecting its statute-of-limitations defense based on the discovery rule and the alleged "inherently undiscoverable" nature of the breach. It contends that, absent fraudulent concealment, the discovery rule should not apply in breach-of-contract actions, particularly those involving commercial contracts. It argues that application of the discovery rule in breach-of-contract actions: (1) is contrary to the statutory language creating the six-year limitation; (2) is improper in cases involving latent injuries; (3) is inappropriate because contract cases are fundamentally different from tort cases; (4) leads to open-ended contractual liability; (5) requires courts and parties to litigate stale claims; and (6) is unfair because other exceptions to the statute of limitations adequately protect innocent plaintiffs in contract actions.[35] In the alternative, if the Court were inclined to apply the discovery rule to breach-of-contract cases, BlueCross argues, it should apply only in a very narrow set of circumstances where the breach is inherently undiscoverable on a categorical basis, rather than on a case-by-case basis.[36] *See, e.g.*, *Wagner & Brown, Ltd. v. Horwood*, 58 S.W.3d 732, 735 (Tex. 2001). Under that standard, BlueCross argues, the systemic underpayments in this case were not inherently undiscoverable, so any claim by IHS to underpayments prior to July 29, 2005, should be barred by the six-year statute of limitations.

In response, IHS notes that several Tennessee intermediate appellate court decisions have followed the rationale in *Goot* in applying the discovery rule to toll the breach-of-contract statute of limitations in situations where the alleged breach was inherently undiscoverable.[37] *See Goot v. Metro. Gov't of Nashville & Davidson Cnty.*,

---

[35] The Amici Curiae Nashville Area Chamber of Commerce, the Greater Memphis Chamber, the Chattanooga Area Chamber of Commerce, the Tennessee Chamber of Commerce & Industry, Tennessee Defense Lawyers Association, and DRI-The Voice of the Defense Bar make similar arguments against applying the discovery rule in breach-of-contract cases. They argue, among other things, that strictly enforcing the statute of limitations in such cases protects commercial certainty and avoids open-ended contract liability.

[36] Amicus Curiae Tennessee Chamber of Commerce & Industry takes a similar alternative position.

[37] Amicus Curiae Professor Kuney filed a brief in support of IHS's position. He asserts that a majority of jurisdictions now apply the discovery rule in breach-of-contract actions to some extent, and argues that, "[f]rom a policy perspective, it makes good sense to apply the discovery rule to the limited class of breach of contract claims identified in *Goot*."

No. M2003-02013-COA-R3-CV, 2005 WL 3031638, at *11 (Tenn. Ct. App. Nov. 9, 2005). IHS maintains that the evidence in the instant case supports the trial court's factual finding that BlueCross's systemic underpayments were, indeed, inherently undiscoverable. It claims that BlueCross's systemic underpayments were difficult to detect because (1) BlueCross made "non-routine" errors spanning hundreds of thousands of commission transactions; (2) the information BlueCross provided to IHS was faulty and unreliable; and (3) BlueCross had exclusive possession of systems and information necessary to determine the underpayment amounts. IHS contends that BlueCross was aware that its own accounting system, called Facets, was faulty and unreliable, but it nevertheless withheld this information from IHS. Consequently, despite having exercised extreme diligence throughout the contractual relationship, IHS could not have discovered the information needed to verify the commission payments due. IHS claims that BlueCross also deceitfully and knowingly breached the parties' agreement in secret and then hindered IHS's discovery of the breach. Under these circumstances, IHS argues, it would be unjust to hold that IHS's breach of contract claim accrued before it knew or should have known of BlueCross's systemic underpayments.

This Court has not addressed either the *Goot* holding or the underlying question of whether, under any circumstances, the discovery rule could apply to toll the six-year statute of limitations in breach-of-contract actions. To determine whether the discovery rule should apply to a certain type of case, this Court considers the specific statute of limitations at issue and then "balances the policies furthered by application of the discovery rule against the legitimate policies upon which" the statute of limitations is based. *Pero's Steak & Spaghetti House v. Lee*, 90 S.W.3d 614, 620 (Tenn. 2002) (hereinafter "*Pero's*") (quoting *Quality Auto Parts Co. v. Bluff City Buick Co.*, 876 S.W.2d 818, 820 (Tenn. 1994)).

The applicable statute of limitations in this case is Tennessee Code Annotated section 28-3-109(a)(3), which provides that a general breach-of-contract action "shall be commenced within six (6) years after the cause of action accrued." The statute does not specify when "the cause of action accrue[s]." Our courts have held that a breach-of-contract cause of action accrues "as of the date of the breach" or, in the case of anticipatory breach, "when the acts and conduct of one party shows [sic] an intention to no longer be bound by the contract."[38] *Greene v. THGC, Inc.*, 915 S.W.2d 809, 810 (Tenn. Ct. App. 1995); *Coleman Mgmt., Inc. v. Meyer*, 304 S.W.3d 340, 348 (Tenn. Ct.

---

[38] Some jurisdictions have a statute that expressly incorporates the discovery rule into the statute of limitations applicable to breach-of-contract claims. *See, e.g.*, Colo. Rev. Stat. § 13-80-108(6); Mo. Rev. Stat. § 516.100. Tennessee does not.

App. 2009) ("A cause of action for breach of contract accrues on the date of the breach or when one party demonstrates a clear intention not to be bound by the contract."). Application of that measure to the facts of this case would result in a holding that a breach occurred each time BlueCross failed to pay IHS the proper amount of commissions on an insurance policy.

Next, we look at "the policies furthered by application of the discovery rule against the legitimate policies upon which statutes of limitations are based." *Pero's*, 90 S.W.3d at 620. Statutes of limitations "reflect a societal choice that actions must be brought within a certain time period." *Redwing*, 363 S.W.3d at 456 (quotation marks omitted). For that reason, "courts construe exceptions to statutes of limitations carefully to assure that they are not extended beyond their plain meaning." *Id.*; *see Quality Auto Parts*, 876 S.W.2d at 820 (similar). "All statutes of limitations are intended to ensure fairness and justice." *Pero's*, 90 S.W.3d at 621.

Balanced against these policy goals are the equitable considerations that led to adoption of the discovery rule. "In 1974, this Court recognized and adopted the discovery rule in response to the 'harsh and oppressive' results of the traditional accrual rule in circumstances in which the injured party was unaware of the injury." *Redwing*, 363 S.W.3d at 458 (citing *Teeters v. Currey*, 518 S.W.2d 512, 516 (Tenn. 1974)). In *Teeters*, a medical malpractice case, the Court described the discovery rule as providing that "the cause of action accrues and the statute of limitations commences to run when the patient discovers, or in the exercise of reasonable care and diligence for his own health and welfare, should have discovered the resulting injury." *Id.* (quoting *Teeters*, 518 S.W.2d at 517). The discovery rule is an "equitable exception" to the statute of limitations. *Pero's*, 90 S.W.3d at 621. "The rule responds to the unfairness of 'requiring that he [a plaintiff] sue to vindicate a non-existent wrong, at a time when injury is unknown and unknowable.'" *Quality Auto Parts*, 876 S.W.2d at 820 (quoting *Teeters*, 518 S.W.2d at 515).

Since *Teeters*, "the discovery rule has been applied to various tort actions including products liability, legal malpractice, and dental malpractice actions." *Redwing*, 363 S.W.3d at 458 (citing *Chambers v. Dillow*, 713 S.W.2d 896 (Tenn. 1986); *Foster v. Harris*, 633 S.W.2d 304 (Tenn. 1982); *McCroskey v. Bryant Air Conditioning Co.*, 524 S.W.2d 487 (Tenn. 1975)); *see also* Justin N. Joy, Comment, *Civil Procedure—Pero's Steak & Spaghetti House v. Lee: Tennessee Declines to Extend the Discovery Rule to Claims of Converted Negotiable Instruments*, 34 U. Mem. L. Rev. 475, 487 & n.63 (2004) (cataloging cases). This Court has declined to apply the discovery rule to actions for defamation, *Quality Auto Parts*, 876 S.W.2d at 822, or to claims for conversion of

negotiable instruments, despite the fact that "[n]ot applying the discovery rule may very well be harsh in certain cases," *Pero's*, 90 S.W.3d at 624; *see also Hunter v. Brown*, 955 S.W.2d 49, 51 (Tenn. 1997) (refusing to apply discovery rule in sexual-abuse case where victim did not have a repressed memory).

In *Goot*, upon which the lower courts relied in the instant case, the intermediate appellate court held that the discovery rule applies only if the breach alleged by the plaintiff is "inherently undiscoverable." *Goot*, 2005 WL 3031638, at *11-12. The plaintiff in *Goot* was the surviving spouse of a deceased former employee of the Nashville Metropolitan Government ("Metro").[39] After the husband/former employee died, the wife received $7,500 in proceeds from her husband's employee-sponsored life insurance policy. She later discovered that the husband had been eligible to apply for a *$50,000* life insurance policy, but Metro failed to inform him of that fact. *Id.* at *2. The wife sued Metro, claiming that it had breached her husband's employment contract by "concealing and failing to inform" him of his eligibility to apply for the larger life insurance policy. *Id.* at *3.

Because the alleged breach occurred in 1987 and the lawsuit was filed in 2001, the wife argued that the six-year statute of limitations should be tolled because the defendant's failure to inform the husband of a benefit he knew nothing about was "inherently undiscoverable." *Id.* at *9. The Court of Appeals in *Goot* agreed. It observed that the discovery rule "alleviates the intolerable result of barring a cause of action by holding that it 'accrued' before the plaintiff discovered the injury or the wrong." *Id.* While there is no need for the discovery rule in most contract cases, it commented, it was also "not difficult to envision circumstances in which a party to a contract would not be aware that the other party has breached the contract." *Id.* at *11 (footnote omitted). *Goot* noted that courts in other states had applied the discovery rule in breach-of-contract cases "where the breach of contract is inherently [undiscoverable]." *Id.* (citation omitted). The *Goot* court added: "The inherently undiscoverable requirement is met when the injured party is unlikely to discover the wrong during the limitations period despite due diligence. To be inherently undiscoverable, the wrong and

---

[39] Although *Goot* was actually a consolidation of several cases with a total of five plaintiff spouses, the claims all involved slightly different facts and different outcomes. For simplicity, we refer in this opinion only to the claim of a single plaintiff, Wanda Faye Jackson. *See Goot*, 2005 WL 3031638, at *6.

- 47 -

injury must be unknown to the plaintiff because of their very nature and not because of any fault of the plaintiff."[40]  *Id.* at \*11 n.31.

The intermediate appellate court in *Goot* observed that "it would have been difficult for [the plaintiff and her husband] to be aware of or discover that [Metro] breached its contract in 1987" by failing to inform them of the benefit, because they did not even know that the benefit existed.  *Id.* at \*12.  The court pointed out that Metro "was in a far superior position when compared to [the plaintiff and her husband]," indicating that Metro was at fault for the couple's lack of knowledge about the benefit.  *Id.*  For these reasons, the court concluded that the breach was inherently undiscoverable, so it applied the discovery rule to toll the six-year statute of limitations.  *Id.*

Tennessee intermediate appellate courts, as well as some federal courts, have cited *Goot* for the general proposition that Tennessee uses the "inherently undiscoverable" test to determine whether the discovery rule would apply in a breach-of-contract case.  *See, e.g.*, *McGhee v. Shelby Cnty. Gov't*, No. W2012-00185-COA-R3-CV, 2012 WL 2087188, at \*9 (Tenn. Ct. App. June 11, 2012); *Taylor v. Metro. Gov't Nashville & Davidson Cnty.*, No. M2007-01774-COA-R3-CV, 2008 WL 5330502, at \*8 (Tenn. Ct. App. Dec. 19, 2008); *House v. Edmondson*, No. W2005-00092-COA-R3-CV, 2006 WL 1328810, at \*17-18 (Tenn. Ct. App. May 16, 2006); *see also Gervasi v. Warner/Chappell Music, Inc.*, No. 3:12-cv-00627, 2014 WL 348189, at \*5 (M.D. Tenn. Jan. 30, 2014); *Networks USA X, Inc. v. Nationwide Mut. Ins. Co.*, 748 F. Supp. 2d 836, 844-45 (E.D. Tenn. 2010); *Capital TCP, LLC v. New Horizon Memphis, LLC*, No. 2:07-cv-02157-JPM-DKV, 2010 WL 2734148, at \*5 (W.D. Tenn. July 9, 2010).  As we have indicated, this Court has not yet weighed in on the issue.

Courts in other jurisdictions are split on whether the discovery rule can apply in breach-of-contract actions.  Some decline to apply the discovery rule to breach-of-contract actions under any circumstances.[41]  Others take the opposite approach, applying

---

[40] The *Goot* court noted two exceptions to the "inherently undiscoverable" application of the discovery rule:  (1) when invoking the rule is inconsistent with the terms of the applicable statute of limitations and (2) the rule cannot supercede a contractually agreed-upon limitations period so long as the contract affords a reasonable time in which to file suit.  *Id.* at \*12.

[41] *See, e.g.*, *Utils. Bd. of City of Opp v. Shuler Bros., Inc.*, 138 So. 3d 287, 293 (Ala. 2013) ("The 'discovery rule' in Alabama applies only to fraud actions and cases involving the fraudulent concealment of the existence of a cause of action." (Citation omitted)); *Chalmers v. Toyota Motor Sales USA, Inc.*, 935 S.W.2d 258, 261 (Ark. 1996) ("[I]n the absence of concealment of the wrong, [a breach-of-contract action begins to accrue] when the injury occurs, not when it is discovered."); *Law v. Law Co. Bldg. Assocs.*, 289

the general discovery rule in breach-of-contract cases in the same way it is applied in torts and other types of actions.[42]  Still other courts take a third path; they apply the discovery rule in breach-of-contract cases only in situations where the breach is "inherently undiscoverable," "inherently unknowable," or "difficult to detect."  Even in those cases, there is no uniform description of the terms.[43]

---

P.3d 1066, 1081 (Kan. 2012) (refusing to apply the discovery rule when the "Kansas Legislature has not provided a discovery exception in" the five-year statute of limitation for breach of contract cases); *Hempel v. Creek House Trust*, 743 N.W.2d 305, 311 (Minn. Ct. App. 2007) ("Minnesota courts 'have declined to adopt the discovery rule' even when confronted with arguments that it would be unfair"); *ACE Secs. Corp. v. DB Structured Prods., Inc.*, 36 N.E.3d 623, 628 (N.Y. 2015) (adhering to the "bright-line" rule that "New York does not apply the 'discovery' rule to statutes of limitations in contract actions"); *Waxman v. Waxman & Assocs., Inc.*, 198 P.3d 445, 452 (Or. Ct. App. 2008) (concluding that the six-year statute of limitation for breach-of-contract actions "is not subject to a discovery rule"); *CLL Assocs., Ltd. P'ship v. Arrowhead Pac. Corp.*, 497 N.W.2d 115, 118 (Wis. 1993) (noting that, in breach-of-contract actions, "unlike in tort law, the need to protect defendants from stale or fraudulent claims outweighs any injustice caused by barring rights of action prior to discovery").

[42] *See, e.g.*, *Bauman v. Day*, 892 P.2d 817, 828 (Alaska 1995) ("[W]e hold that in the absence of a statute directing a contrary rule, the discovery rule is applicable to common law contract causes of action."); *Santee Portland Cement Co. v. Daniels Int'l Corp.*, 384 S.E.2d 693, 695 (S.C. 1989) ("We see no justification for refusing to extend the discovery rule to contract causes of action."), *overruled on other grounds by Atlas Food Sys. & Servs., Inc. v. Crane Nat'l Vendors Div. of Unidynamics Corp.*, 462 S.E.2d 858, 860 (S.C. 1995); *Redland v. Redland*, 288 P.3d 1173, 1186 (Wyo. 2015) ("Wyoming is a discovery jurisdiction, which means that a statute of limitation is triggered when a plaintiff knows or has reason to know of the existence of a cause of action."); *see also Poffenberger v. Risser*, 431 A.2d 677, 680 (D.C. Cir. 1981) (applying the discovery rule in "all actions").

[43] *See, e.g.*, *Gust, Rosenfeld & Henderson v. Prudential Ins. Co. of Am.*, 898 P.2d 964, 966 (Ariz. 1995) (applying the discovery rule when "the plaintiff's injury or the conduct causing the injury is difficult to detect"); *Apr. Enters., Inc. v. KTTV*, 147 Cal. App. 3d 805, 831 (Ct. App. 1983) ("[W]e hold the discovery rule may be applied to breaches which can be, and are, committed in secret and, moreover, where the harm flowing from those breaches will not be reasonably discoverable by plaintiffs until a future time."); *Int'l Mobiles Corp. v. Corroon & Black/Fairfield & Ellis, Inc.*, 560 N.E.2d 122, 126 (Mass. App. Ct. 1990) (applying the discovery rule when the breach "is not capable of being discovered because it is based on an 'inherently unknowable' wrong") *Cnty. of Morris v. Fauver*, 707 A.2d 958, 972-73 (N.J. 1998) (applying the discovery rule only when the suit involves "inherently undiscoverable" types of injuries); *Wagner & Brown, Ltd. v. Harwood*, 58 S.W.3d 732, 734-35 (Tex. 2001) (applying the discovery only to certain categories of contracts, those in which the injury is inherently undiscoverable and objectively verifiable); *see also El Pollo Loco, Inc. v. Hashim*, 316 F.3d 1032, 1039 (9th Cir. 2003) (applying California law and describing the "unique breach of contract cases" to which the discovery rule applies); *In re Coastal Plains, Inc.*, 179 F.3d 197, 214-15 (5th Cir. 1999) (applying Texas law).

In this case, IHS does not argue that we should apply the general discovery rule as it is applied in tort cases for example. Instead, IHS asks us to adopt the "inherently undiscoverable" standard in *Goot* and affirm the trial court's holding that the facts in this case meet that standard.

We refrain from doing so. The facts of this case do not compel us to either reject or adopt the holding in *Goot*, because the breach in this case does not qualify as "inherently undiscoverable" under any definition. Here, the trial court found that BlueCross's breach (the systemic commission underpayments) was inherently undiscoverable based on the following facts:

> [IHS] proved in several ways that prior to 2011, when [IHS analyzed its internal records], [BlueCross's] underpayment of commissions was inherently undiscoverable.

> First, there was a disparity of knowledge, and it was [BlueCross] who had superior knowledge and control. The proof established that [BlueCross], in the first instance, determined the information reported to [IHS] on the monthly commission statements. Additionally, [IHS's] information in SLIM [IHS's internal database] was dependent upon the reliability of [BlueCross's] information which was shown by [IHS] to be unreliable. Further, the Court accredits the testimony of Mr. Conroy who designed the SLIM system that it could not detect underpayments of commissions, and such underpayments were inherently undiscoverable by [IHS].

> Additionally, [IHS] did not have access to the following information which the proof established was necessary to determine underpayments:

> —[BlueCross's] Facets system [its commission reporting and payment system]
> —[BlueCross's] cross reference table with Broker Ids
> —Applicants' social security numbers
> —All termination notices
> —All renewal notices

> The proof further established that [IHS] was diligent in attempting to detect errors by reviewing the monthly commission statements from [BlueCross], preparing reports for subagents, taking and responding to subagents' underpayment or nonpayment inquiries and continuously contacting

[BlueCross] to track these down, and finalizing and transmitting a report and commission check to each subagent. The proof revealed, however, that [IHS's] ad hoc inquires [sic] about commission issues over the years of the General Agency Agreement could not uncover the systemic underpayments because of the variety and non-routine occurrence of the issues, and insufficient information to perform checks.

In addition, there was proof that [BlueCross] knew about the faultiness of Facets [its commission reporting and payment system] and the likelihood of significant amounts of commission payment errors which knowledge was not shared with [IHS]. There was abundant proof, contained in the above findings, that over the life of the [General Agency Agreement] [BlueCross] knew the deficiencies and faultiness of Facets, the likelihood and ongoing occurrence of errors in commission credit due to human error in manual adjustments, and that two Ernst & Young audits had flagged payment of incorrect commission rates due to internal controls. Yet the proof was clear that [IHS] was not told this. [BlueCross] created a sense of security that there were no problems with Facets other than the ad hoc questions by IHS.

[BlueCross] also inhibited inquiry by [IHS] with promises of a new system "Callidus." The Court accredits the testimony of [IHS's] witnesses that at a dinner with [BlueCross] in March of 2010 . . . the [BlueCross] representatives assured [IHS] that Callidus would be implemented soon and would improve the commission reporting and payment system. Ultimately Callidus was not implemented by [BlueCross]. The Court finds that beginning in 2008, [BlueCross] studied Callidus to upgrade Facets to address the recurring errors. By December of 2009 [BlueCross] was implementing Callidus but had to abandon that because it was unable to exchange data with Facets. [IHS], however, was not told any of this.[44]

Based upon all of the above evidence, the Court concludes that continuous, ongoing underpayments were inherently undiscoverable by [IHS], and the statute of limitations is tolled.

---

[44] Despite its finding that BlueCross intentionally withheld information, the trial court denied IHS's request for sanctions against BlueCross for delaying or impeding its investigation. It found that the extended time of discovery was due to "factors outside the parties' control" such as the "age of some of the data" and "the volume of information requested by IHS."

*IHS*, 2017 WL 2105988, at 11-12 (quoting trial court's decision).[45] The Court of Appeals affirmed, holding that the evidence supported the trial court's conclusion that "IHS could not have discovered this information through reasonable investigation because IHS's internal database was dependent upon the reliability of BlueCross's information, which was shown to be unreliable." *Id.* at 12.

From our review of the record, the basic facts as found by the trial court are well supported by the evidence. These facts demonstrate numerous obstacles that presented particular challenges to IHS's efforts to detect errors in BlueCross's commission payments.

The larger question, however, is whether those facts support the trial court's conclusion that Blue Cross's systematic underpayment of commissions was "inherently undiscoverable." We think not. Although the facts as found by the trial court indicate that the discovery of the breach in this case was not easy, they also establish that, in the early years, IHS had the same access to information—and the same ability to request information from BlueCross—that it had in 2012.

The breach at issue arises from a commercial contract between two sophisticated business entities, each expected to use due diligence to protect its own interests. "Due diligence may include asking a contract partner for information needed to verify contractual performance." *Via Net v. TIG Ins. Co.*, 211 S.W.3d 310, 314 (Tex. 2006); *see Wagner & Brown*, 58 S.W.3d at 735 ("[A] royalty owner should exercise due diligence to determine whether charges made against royalty payments are proper and reasonable.").

As found by the trial court, BlueCross's faulty Facets system resulted in BlueCross making errors in tracking policies and other things that adversely affected the amount of commissions paid to IHS. IHS, however, had its own methods of tracking applicant and policy information.[46] IHS was well aware that its own tracking was based on the quality of the information provided by BlueCross. In the early years of the parties' contractual relationship, Mr. Walker could have verified the accuracy of commission payments in the same way he did in later years, but he did not do so. Instead, Mr. Walker

---

[45] After determining that BlueCross's ongoing underpayments were inherently undiscoverable, the trial court did not actually determine the date on which IHS knew or should have known of sufficient facts to put it on notice of the breach.

[46] IHS began using SLIM in 2003 to house information on policy applicants.

and IHS only made monthly, "ad hoc" inquiries; those inquiries stopped short of requesting a full accounting and verifying that IHS was being paid its due commissions and instead chose to rely to a great degree on the information received from BlueCross. *See Kardell v. Union Bankers Ins. Co.*, No. 05-01-00662-CV, 2002 WL 1809867, at \*4 (Tex. Ct. App. Aug. 8, 2002) (finding that underpayment of commissions was not inherently undiscoverable when the agent "received periodic statement detailing the commissions," "[t]he information that supported the commission payments was available for his review at his request," and, "[a]lthough a time-consuming process, the supporting files could then be used to determine if [the agent] was being paid" the appropriate amount of commissions); *see also Slusser v. Union Bankers Ins. Co.*, 72 S.W.3d 713, at 718 (Tex. Ct. App. 2002) (finding that underpayment of commissions is not inherently undiscoverable).

To be sure, verifying BlueCross's information would have been a difficult task, especially when the Facets system was faulty. However, had an accurate accounting of commissions earned been demanded and verified from the beginning, the years of underpayments would never have occurred. Even after BlueCross failed to implement the promised new accounting system, IHS continued to rely on BlueCross to provide accurate information. It did so at its own peril.

In short, the fact that Blue Cross's underpayments were based on complicated mathematical equations does not make them "inherently undiscoverable" as we understand that term in this context. Therefore, even if we were to adopt the *Goot* "inherently undiscoverable" discovery rule in breach-of-contract cases, these facts do not meet that standard.

For this reason, we reverse the lower courts on this issue and hold that IHS's claim for damages resulting from systemic underpayments before July 29, 2005 (six years prior to filing suit) must be dismissed as untimely.

## CONCLUSION

In sum, we hold that BlueCross did not breach the 2009 Agency Agreement by modifying renewal commission rates for existing policies in the May 2011 Schedule. BlueCross did, however, breach the parties' agreement by refusing to pay post-termination commissions to IHS and instead making commission payments directly to the producing agents. In addition, because the indemnity provision in the 2009 Agency Agreement does not specifically authorize fee shifting in a suit between the two contracting parties, we hold that IHS is not entitled to an award of attorney fees. Finally,

we hold that the discovery rule does not apply to this breach-of-contract action, because the alleged breach of systemic underpayments was not "inherently undiscoverable" under any definition of that term. Therefore, we dismiss as untimely IHS's claim to any systemic commission underpayments that accrued before July 29, 2005.

The decision of the Court of Appeals is affirmed in part and reversed in part as set forth above. The case is remanded to the trial court for further proceedings consistent with this opinion. Costs on appeal are to be taxed equally to Defendant/Appellant BlueCross BlueShield of Tennessee, Inc., and Plaintiff/Appellee Individual Healthcare Specialists, Inc., and their sureties, for which execution may issue, if necessary.

_____

HOLLY KIRBY, JUSTICE