NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0283n.06

Case No. 20-6193

# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

|  |  |  |
|---|---|---|
| MASSACHUSETTS MUTUAL LIFE INSURANCE COMPANY, | ) ) ) | **FILED**<br>Jun 09, 2021<br>DEBORAH S. HUNT, Clerk |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT |
| v. | ) ) | COURT FOR THE WESTERN DISTRICT OF TENNESSEE |
| RCS – GERMANTOWN I, LLC, *et al.*, | ) ) | |
| Defendants-Appellants. | | |

**O P I N I O N**

BEFORE: SUTTON, Chief Judge; McKEAGUE and DONALD, Circuit Judges.

**McKEAGUE, Circuit Judge.** Massachusetts Mutual Insurance Company (MassMutual) leased RCS – Germantown I, LLC's (RCS's) office space until MassMutual purported to exercise an option to terminate the lease when it didn't need the office space anymore. RCS disagreed with MassMutual's understanding of the lease's Termination Option, so MassMutual sued RCS. Both parties moved for summary judgment and the district court granted judgment to MassMutual. The court held that the Termination Option unambiguously allowed MassMutual to cut the lease short because, due to a change in business conditions, MassMutual didn't need the property anymore. We **AFFIRM** the district court's grant of summary judgment to MassMutual and denial of summary judgment to RCS.

**I**

MassMutual acquired the Memphis, Tennessee-based First Mercantile Trust Company (FMT) as a subsidiary. At the time of its acquisition, FMT had an existing lease at 57 Germantown Court in the Kimbrough Building (the Property). The Property was owned by DRA CRT Germantown Center, LP (Original Landlord), which was represented by Investec Realty Services. Because FMT's lease was soon to expire, MassMutual hired Cushman & Wakefield to explore options for suitable office space to accommodate its acquisition of FMT and to add an FMT-related call center.

To that end, Cushman contacted Investec and asked if MassMutual could renew FMT's lease. After negotiations, including several revisions, Cushman and Investec executed a lease. As relevant here, the executed lease included a Termination Option:

> **TERMINATION OPTION:** Provided Tenant is not in default at the time of exercise or during the time period from notice to the effective termination date and the Lease is then in full force and effect, Tenant shall have a one time right to terminate this Lease subject to the terms and conditions of this Section. **Tenant's termination right shall be limited only to the situation in which the business conditions in this particular office of Tenant drastically changes to the extent that Tenant no longer needs to lease office space in the Memphis, Tennessee area.** In such an event, then Tenant shall have the right to terminate the Lease effective after the 120th month of rent paying occupancy (the "Termination Date") by giving no less than twelve (12) months' prior written notice and paying the unamortized Tenant Improvement Allowance and brokerage fees plus nine (9) months of the then current monthly Rent at the time of notice. Such costs shall be amortized over the Lease Term with an 8.00% interest rate. **This option is not to be construed as a renegotiation of the existing Lease but is limited to the termination of a business unit or units.**

The Termination Option was revised during negotiations. The first draft of the lease had no termination option. But MassMutual was hesitant to sign the 15-year lease without one, so Cushman suggested the first Termination Option language:

> Termination Option: Tenant shall have the right to terminate the Lease on the tenth (10th) anniversary of the Lease Commencement Date by giving no less than twelve

> (12) months' prior written notice and paying the unamortized Cash Allowance and brokerage fees. Such costs shall be amortized over the Lease Term without interest.

Internally, an Investec broker suggested they add that the Termination Option was "not to be construed as a renegotiation of the existing Lease but is limited to termination of business unit or units." According to Investec, the addition's purpose was to "prohibit MassMutual from terminating the Lease and moving the existing business at the Property to other leased office space" in Memphis.[1]

The Original Landlord added to what Investec would counter-propose by suggesting that Investec draw from language in another lease of theirs. The Original Landlord's other lease had a termination option providing that "Tenant's termination right shall be limited only to the situation in which the business conditions in this particular office of Tenant drastically change to the extent that Tenant no longer needs to lease office space in the Nashville Tennessee area" and that "Tenant agrees that the foregoing termination right shall not permit Tenant to terminate the Lease and move its existing business to other leased office space in the Nashville area." Investec first adopted that proposed language (replacing "Nashville" with "Memphis"), and then reverted the final sentence back to the original: the Termination Option was "not to be construed as a renegotiation of the existing Lease but is limited to termination of business unit or units." According to Investec, this round of revisions "was to reflect the only circumstances the parties envisioned as grounds for terminating the Lease: a 'termination of business unit or units;' i.e., if the business operations conducted by MassMutual at the leased premises ended."

---

[1] MassMutual already had operations in Memphis (for its retail insurance agency); FMT's provision of trust-related financial services was dissimilar to any existing MassMutual business activities in Memphis.

That's (as relevant here) the termination clause that made it into the lease. The two critical sentences stated that

> [(1)] Tenant's termination right shall be limited only to the situation in which the business conditions in this particular office of Tenant drastically changes to the extent that Tenant no longer needs to lease office space in the Memphis, Tennessee area. . . . [And (2)] [t]his option is not to be construed as a renegotiation of the existing Lease but is limited to the termination of a business unit or units.

RCS acquired the Property from the Original Landlord years later. After RCS acquired the Property, the call center failed and MassMutual sold FMT to a third party—MassMutual didn't need office space to support either anymore. MassMutual tried to exercise the Termination Option,[2] but RCS rejected the termination.

MassMutual sought a declaratory judgment that it could terminate the lease. RCS sought the opposite. The central issue was whether the clause requiring that MassMutual "no longer needs to lease office space" in Memphis meant for use by FMT and the call center (MassMutual's position), or if it meant the need for any office space in Memphis (RCS's position). RCS moved for a judgment on the pleadings and the district court denied the motion because the court was not yet convinced whether the Termination Option was ambiguous. Both parties moved for summary judgment.

After hearing arguments for summary judgment, the court became convinced of the Termination Option's unambiguity. The district court reasoned that, when read as a whole, rather than in isolation, the Termination Option was limited only to MassMutual's use of that office space for FMT and its call center—that MassMutual had other Memphis office space was not relevant. While the district court did not consider parol evidence of the lease negotiations, it noted that if it had considered the evidence, the result would not change. The negotiations made clear that each

---

[2] MassMutual paid RCS a termination fee of $1,300,554.

party intended that the Termination Option relate only to the business units and office space at the Property.

RCS appeals the grant of summary judgment for MassMutual and the denial of its own motion.

## II

We review a grant of summary judgment and a district court's contract interpretation de novo. *Spec's Fam. Partners, Ltd. v. First Data Merch. Servs. LLC*, 777 F. App'x 785, 787 (6th Cir. 2019); *West v. Shelby Cnty. Healthcare Corp.*, 459 S.W.3d 33, 42 (Tenn. 2014) ("The interpretation of a written contract is . . . a question of law."). "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). There is no dispute that Tennessee contract law governs our interpretation of the Termination Option. *Cf. Spec's Fam. Partners*, 777 F. App'x at 787.

In Tennessee, the "cardinal rule" of contract interpretation "is that courts must interpret contracts so as to ascertain and give effect to the intent of the contracting parties." *Individual Healthcare Specialists, Inc. v. BlueCross BlueShield of Tenn., Inc.* (*IHS*), 566 S.W.3d 671, 688 (Tenn. 2019). To effectuate that cardinal rule, "Tennessee caselaw demonstrates resolve to keep the written words as the lodestar of contract interpretation." *Id.* at 694. Absent ambiguity, contractual language "is interpreted according to its plain terms as written, and the language used is taken in its plain, ordinary, and popular sense." *Maggart v. Almany Realtors, Inc.*, 259 S.W.3d 700, 704 (Tenn. 2008) (quotation omitted).

In challenging the district court's decision, RCS urges us to focus on one phrase of the Termination Option: The "Tenant no longer needs to lease office space in the Memphis, Tennessee

area." RCS's unrelenting focus on this phrase is understandable. For when read in isolation, the phrase indeed suggests that MassMutual's maintenance of unrelated corporate offices in the Memphis area deprives the insurance company of its right to exercise the Termination Option.

But a venerable tenet of contract law, and of communication in general, reminds us that we do not read words in isolation. We read them in context. Words are indeed "known by the company they keep," or, for those who prefer Latin, noscitur a sociis. "Contractual terms should be . . . construed harmoniously to give effect to all provisions and to avoid creating internal conflicts." *D & E Const. Co. v. Robert J. Denley Co.*, 38 S.W.3d 513, 518–19 (Tenn. 2001) (quotation omitted). Any "contract must be viewed from beginning to end and all its terms must pass in review, for one clause may modify, limit or illuminate another." *Cocke County Bd. of Highway Comm'rs v. Newport Utils. Bd.*, 690 S.W.2d 231, 237 (Tenn. 1985).

The question at hand is what "office space" means. Does it refer to any office space used by any unit of MassMutual in the Memphis area, as RCS argues? Or does it refer only to office space used by this unit of MassMutual, as the district court determined? Language before RCS's chosen phrase and language after it confirm that the district court was right.

Here, to repeat, is the provision in context:

> [(1)] Tenant's termination right shall be limited only to the situation in which the business conditions in this particular office of Tenant drastically changes to the extent that Tenant no longer needs to lease office space in the Memphis, Tennessee area. . . . [And (2)] [t]his option is not to be construed as a renegotiation of the existing Lease but is limited to the termination of a business unit or units.

The language that precedes RCS's isolated phrase provides that MassMutual may terminate the lease if "the situation in which *the business conditions in this particular office* of Tenant drastically changes to the extent that Tenant no longer needs to lease *office space* in the Memphis, Tennessee area." In context, this early language shows that "office space" refers to "this particular

office of Tenant," namely the office space used for FMT and the call center. Read together, "office space" and "business conditions in this particular office of Tenant" show that MassMutual may terminate the lease if the insurance company doesn't need to lease office space related to the business located at the leased Property.

A similar conclusion follows from the clause that appears later. The last sentence of the Termination Option likewise demonstrates that the option is limited in scope to the instant lease and the Property. It says that this "option" is "limited to the termination of business unit or units," showing that the drafters knew how to refer to business conditions of a particular unit or particular office of MassMutual—namely, office space used for FMT and the call center. Put another way, MassMutual can exercise the Option if they terminate business units at the Property (like FMT and the call center), but can't if the exercise is just a renegotiating tactic. The last sentence has nothing to do with MassMutual operations outside of the Property. Reading the limitation that MassMutual must not "need[] to lease office space in Memphis" along with the need for a "drastic[] change" "in this particular office," the limitation to the "terminati[on] of a business unit" related to the "existing Lease," and the caveat that MassMutual not use the Option as a renegotiation tactic, we interpret the Option to be limited to MassMutual's lease of the Property.

Like the district court, then, we conclude that the Option unambiguously allowed MassMutual to terminate the lease as long as business conditions changed for its businesses at the Property (FMT and the call center) such that MassMutual no longer needed office space for those business units in Memphis.

RCS's contrary interpretation of the Option contradicts common sense. They see the requirement of a drastic change of business conditions at the Property as a cause and MassMutual's lack of need for any Memphis office space as an effect. Under that interpretation, whatever

happens at the Property must cause MassMutual to vacate Memphis. But the cause-and-effect argument doesn't make sense because MassMutual's new venture was never related to MassMutual's other Memphis-based business. In other words, FMT's and the call center's failure was never going to cause MassMutual to leave Memphis. Neither clause of that sentence (or any part of the lease) contemplates MassMutual's operations outside of the Property, so it doesn't make sense to read into the Option that MassMutual predicated their unrelated Memphis operations on how this new venture fared. *See Trice v. Com. Union Assurance Co.*, 397 F.2d 889, 892–93 (6th Cir. 1968) ("Where an agreement is susceptible of two different interpretations, of which one is reasonable and the other is unreasonable, the reasonable one will be adopted." (applying Tennessee law)); *Trailmobile, Inc. v. Chazen*, 370 S.W.2d 840, 844 (Tenn. Ct. App. 1963); *Barnes v. Black Diamond Coal Co.*, 47 S.W. 498, 499 (Tenn. 1898) ("Common sense must be applied to each case, rather than any technical rules of construction.") (quoting *Leonard v. Dyer*, 26 Conn. 172, 172 (1857)). Such a strong reading would render the Termination Option meaningless.

Parole evidence also plays no role in this case because the Option is unambiguous. But even if we considered evidence from the lease negotiations, we would come to the same conclusion.

Tennessee law allows the use of negotiations as contextual evidence to interpret a contract's terms. If a court uses parol evidence to interpret a contract, it can use context to "elucidate[,]" but not "vary, contradict, or supplement[,] the contractual terms of a fully integrated agreement." *IHS*, 566 S.W.3d at 697–98 (first quoting *URI, Inc. v. Kleberg County*, 543 S.W.3d 755, 765 (Tex. 2018)).

Here, the negotiations conclusively elucidate what the parties meant when they limited the Option "to the extent that Tenant no longer needs to lease office space in the Memphis, Tennessee

area." The negotiators for the Original Landlord stated that they meant for the limitation only to apply to "the existing business at the Property," not to all of MassMutual's operations in Memphis. In other words, the Original Landlord's brokers believed that MassMutual could exercise the Option "if the business operations conducted by MassMutual at the leased premises ended." MassMutual and its brokers had the same understanding. RCS's argument to the contrary, that the negotiators did not directly discuss the meaning of "needs to lease office space" in Memphis is unconvincing because the negotiation evidence nevertheless demonstrates "the sense in which they mutually understood ['office space'] at the time." *IHS*, 566 S.W.3d at 688 (quoting *McNairy v. Thompson*, 33 Tenn. (1 Sneed) 141, 149 (1853)).

### III

Because we affirm the district court by holding the Termination Option to be unambiguous, we need not address arguments about latent defect or mutual mistake. Likewise, RCS fails to point to any disputed material fact that should have precluded summary judgment.[3] The judgment of the district court is **AFFIRMED**.

---

[3] We decide today that MassMutual could exercise the Termination Option if business conditions drastically changed (like if MassMutual terminated the business units at the Property), resulting in MassMutual not needing the Property for those business units. It's undisputed that FMT and the call center were new business units. We agree with RCS's corporate representative that good examples of drastic changes to business conditions can include "[g]oing out of business," "[g]oing bankrupt," and "[s]elling the business." It's undisputed that the call center "failed" and that MassMutual sold FMT to a third party. We don't see any genuine, material dispute that the business conditions changed or that MassMutual resultingly didn't need the Property for those units anymore; the district court correctly held summary judgment to be proper.